[No. H032378. Sixth Dist. Nov. 17, 2009.]

EPIC COMMUNICATIONS, INC., et al., Plaintiffs and Appellants, v. RICHWAVE TECHNOLOGY, INC., et al., Defendants and Respondents.

316

COUNSEL

Greenberg Traurig, J. James Li, Cindy Hamilton and David Perez for Plaintiffs and Appellants.

Wang, Hartman, Gibbs & Cauley, Richard F. Cauley and Peter O. Huang for Defendants and Respondents.

OPINION

RUSHING, P. J.—This is an action by a Taiwanese corporation and its California subsidiary seeking damages for an alleged misappropriation of intellectual property originally transferred by their predecessor in interest, a California corporation, to a corporation in Taiwan. The transfer took place pursuant to a joint development agreement negotiated in substantial part by a Taiwanese engineer then employed by the transferee corporation. Three defendants are named: the transferee corporation, the engineer who negotiated the development agreement, and a second Taiwanese corporation formed by her as a "spin-off" of the transferee. The trial court granted a motion by the engineer and the "spin-off" corporation to quash service of process, reasoning that even if those defendants had sufficient contact with California to otherwise be subject to the jurisdiction of its courts, the Taiwanese residence of the principal *plaintiff* corporation made it unreasonable to exercise jurisdiction in California. We reject this conclusion. A refusal by California courts to exercise jurisdiction cannot be justified by the mere fact

that a claim arising from California contacts is prosecuted by a nonresident. While the foreign status of an assignee might in some cases reduce the *state's interest* in adjudicating a dispute, that is at most a subsidiary consideration that cannot by itself justify a denial of access to our courts. The principal inquiry remains whether subjecting *defendant* to local jurisdiction comports with fair play and substantial justice. The residence of the current owner of the claim has little if any bearing on that inquiry. Here the two Taiwan defendants engaged in conduct in California, and caused effects in California, that made it readily foreseeable that they would be haled into court here in the event of a dispute of the present type. We will therefore reverse the order quashing service of summons.

## Background

### A. *Design Services Agreement*

The intellectual property at issue was transferred under a joint development agreement between OEpic, Inc. (OEpic), a Delaware corporation registered to do business in California, and defendant ALi Corporation (ALi), a Taiwanese corporation, also apparently sometimes known as Acer Laboratories, Inc., or some variant thereon. OEpic, which plaintiffs describe as "defunct," was in the business, among others, of "developing and marketing high speed and optical communication semiconductor devices and integrated circuits, including power amplifiers." Toward that end it employed a team of engineers at offices in Sunnyvale. ALi in turn employed a team of engineers in Taiwan, headed by defendant Shyh-Chyi Wong, a resident of Taiwan.

It is unclear which of the coventurers initiated the discussions leading to the joint development project. Wong declared that "OEpic contacted ALi" in the summer of 2002 and "expressed interest in working together." Yi-Ching Pao declared that on an unspecified date in 2002, Wong "visited me at OEpic's office in Sunnyvale to initiate a talk on potential design collaborations with OEpic."[1] Cindy Yuen, OEpic's vice-president of high-speed electronics, declared that in early August of 2002, ALi "contacted me, inquiring [into] the possibility of arranging a meeting between myself and . . . Wong."[2]

---

[1] Wong declared that Pao "first met me in Taiwan during the Summer 2002 when I was an employee of ALi Corporation and Pao visited ALi headquarters in Taipei." As is all too characteristic of both sides' showings in this matter, the averment is plagued by ambiguity. Does this describe her first encounter with Pao or only the first time they met *in Taiwan*? The question appears academic since the averment neglects to connect this meeting with the present case. All it really establishes is that Pao was present in Taiwan at some point during the described period.

[2] Neither of these accounts unequivocally characterizes the described contact as the initial one. Nor does either identify the human agent through whom the contact was made. These

That ALi was in the relative position of supplicant, or at least initiator of contact, may be suggested by the fact that it was OEpic which required ALi to execute a nondisclosure agreement, and not vice versa, as a condition of participating in exploratory discussions. The agreement contemplated exchanges of confidential information in the course of discussions concerning a "business opportunity of mutual interest . . . ." Although the agreement does not specify the nature of the opportunity, it is undisputed that it concerned development of a silicon-germanium (SiGe) power amplifier (PA) or linear power amplifier (LPA) for use in wireless networking devices. Both parties agreed not to use or further disclose information exchanged under the agreement for purposes beyond the discussions and each party's evaluation of the opportunity. Wong signed the agreement on or about August 15, 2002, on behalf of ALi as its "AVP" (associate vice-president) of "RF/Communications." OEpic's president and CEO, Yi-Ching Pao, signed the agreement for OEpic.[3]

Yuen declared that, about a week after signing the nondisclosure agreement, Wong met with her at OEpic's Sunnyvale offices to discuss the proposed project. They mainly discussed "radio frequency . . . front-end integrated circuit . . . designs." Wong told Yuen that although her RF (radio frequency) design group in Taiwan was "highly qualified and motivated," it "lacked the [sic] experience in high frequency RC [sic][4] designs." For that reason, she said, "ALi was looking for a partner in 'RF front-end IC designs.' " Wong "proposed that OEpic help ALi with its SiGe power amplifier design in a co-design project." The meeting concluded with a decision that Wong would "contact [OEpic president] Pao to talk about further details of the business arrangement."

Yuen declared that over the next six months or so, "Wong visited OEpic a few times to further discuss the potential collaboration between OEpic and ALi." These included a "lengthy meeting" between Yuen and Wong at

---

averments thus further exemplify a certain vagueness that pervades both sides' demonstrations. Another example is furnished by Wong's averment that she signed the nondisclosure agreement "as an ALi representative in Taiwan." This is too ambiguous to establish that she was in Taiwan when she signed. Similarly vague is her averment that in November 2002, she "visited the California office of dissolved OEpic *for the first time during a business trip for regular ALi matters.*" (Italics added.) We have no way of knowing whether such equivocal constructions, which recur throughout both parties' demonstrations, are intentional.

[3] Although plaintiffs failed to present direct evidence of Pao's residence or his location at pertinent times, all four of his declarations in the record recite that they were executed in Sunnyvale, California.

[4] Although "RC" is a known term in electronics, referring to a resistor-capacitor circuit, filter, or network, here it appears to be a typographical error in lieu of "IC," an abbreviation for integrated circuit. "IC," along with "RF," is explained in the text of the Yuen declaration, while "RC" is not. Further, Yuen's notes of the August 23 meeting describe Wong as saying that the ALi design team's "high frequency *IC* design experience is lacking." (Italics added.)

OEpic's Sunnyvale office on November 13, 2002. Wong was "very specific about ALi's goal," which was "to find a partner to develop 2.4G[Hz] and 5.3G[Hz] power amplifiers using SiGe HBT technology of TSMC foundry."[5] ALi had evaluated products from other vendors but found them unsatisfactory. Wong "made it clear that ALi would like OEpic to develop power amplifiers . . . or linear power amplifiers . . . based on [the] OEpic team's extensive experience in [PA] and [LPA] product[s]." By the conclusion of this meeting, Yuen declared, she and Wong had "reached the agreement on most items in this partnership, which eventually became the framework" of the parties' agreement to collaborate.

Wong acknowledged that she made "personal visits to the California facilities of the dissolved OEpic" but declared that she did so "while [she] was an employee of co-defendant ALi, not Richwave. My last visit to the California facilities of OEpic occurred before Richwave even existed." She went on to declare, "I only visited OEpic's California facilities twice for a few hours each time while on trips to the United States visiting other companies as well (I visited as an <u>ALi</u> employee both times, with the last visit in January 2003, and I never visited again OEpic California during the execution of the Design Services Agreement). My two brief physical visits were limited to the possibility of collaboration between OEpic and my employer at the time ALi." (Original underscoring, punctuation corrected.)[6]

Effective February 15, 2003, ALi and OEpic entered into a formal design services agreement, which contemplated that OEpic would design, for ALi's use, a "high performance Power Amplifier" or "Linearized Power Amplifier" for wireless applications. This agreement was executed on behalf of ALi by Hsi-Yuan Hsu, apparently an executive vice-president, and by Pao on behalf

---

[5] This apparently means that ALi was seeking a partner to develop wireless networking power amplifiers using SiGe heterojunction bipolar transistors of a type associated with, and presumably manufactured by, the Taiwan Semiconductor Manufacturing Company.

[6] Again the probative tendency of the quoted averments is cast in doubt by the appended qualifying phrases. In the first sentence the phrase "while on trips . . . visiting other companies," leaves open the possibility that Wong visited OEpic on trips *not* including visits to other companies. The second sentence, mysteriously set off in parentheses, is rendered nearly meaningless by the phrase, "during the execution of the Design Services Agreement," which could mean at least two quite different things, both of them tending to render the statement irrelevant. Similar perplexities plague Wong's later averment that "In November 2002, I visited the California office of . . . OEpic for the first time during a business trip for regular ALi matters (the disputed power amplifier technology was not discussed)." A clear assertion that she had never visited OEpic's office before November 2002 would conflict directly with Yuen's detailed and specific averments concerning a meeting with Wong, in those offices, on August 23, 2002. But it is difficult to say that the statements conflict when they can be reconciled by reading Wong's adverbial phrases to limit the tenor of her assertions. So read, however, they lose much or all of their relevance to any material issue.

of OEpic. It required ALi, which it identified as "Customer," to pay $100,000 for the design, plus royalties up to $1.75 million for covered products "that ALi sells into its market channels." The agreement restrained ALi from disclosing any confidential information it might acquire from OEpic. It also prohibited assignment of the agreement by either party without the other's consent, except in connection with a "corporate reorganization, consolidation, merger, or sale of substantially all of [the assigning party's] assets." The agreement recited that it would "bind and inure to the benefit of each party's successors and permitted assigns."[7]

Plaintiffs allege that OEpic made its first delivery of design materials under the agreement in May 2003. According to Yuen, over the ensuing months "ALi's RF design group, which is [*sic*] managed by Wong, interacted directly with OEpic's design group," all of whose members were California residents. "Wong was the manager on the ALi side," she averred, "while I managed the development team on the Epic side. Wong oversaw all the communications between the two companies; nearly all emails were copied to her. She also commented from time to time on matters such as project scheduling and technical designs."

### B. *Formation of Richwave*

OEpic President Pao declared that in December 2003, "Wong and her group spun off to form [defendant] Richwave [Technology, Inc.]" (Richwave). Wong denied that Richwave is "a 'spin-off' of ALi," characterizing it instead as "a Taiwanese company which was founded in part by former employees of Ali." Neither party indicates what it means by "spin-off."[8] Whatever they mean,

---

[7] Unmentioned by the parties is a clause by which the signatories agreed to arbitrate any dispute "arising out of, in relation to, or in connection with" the agreement "in Santa Clara County, California," with the arbitrators applying "California law to the merits of any dispute or claim, without reference to rules of conflicts of law." Presumably the parties have tacitly waived the undertaking to arbitrate by their mutual failure to invoke it.

[8] The term "spin-off" apparently originated in American tax law to describe the creation of a new corporation whose stock is distributed to the shareholders of a preexisting, progenitor corporation. (*Commissioner of Internal Revenue v. Baan* (9th Cir. 1967) 382 F.2d 485, 490; cf. *id.* at p. 491, fn. 9 [distinguishing "split-off" and "split-up"]; 16 Oxford English Dict. (2d ed. 1989) p. 242; see *id.* at pp. 231–232.) Apparently, the rub in that setting was that such a transaction might be used to distribute profits to shareholders in the form of stock, thereby avoiding reportable gains or income. Within a few years the term had acquired a much broader meaning, including "a business, organization, etc., developed out of or by (former) members of another larger business, etc." (16 Oxford English Dict., *supra*, at p. 242; see Investopedia <http://www.investopedia.com/terms/s/spinoff.asp> [as of Nov. 17, 2009].) Both parties here are using the word in some broader sense than the original one. Thus plaintiffs allege that after ALi "spun-off Richwave in 2004," it "owned nineteen percent (19%) of Richwave shares."

Wong's denial is flatly impeached by her own unguarded descriptions of Richwave, in e-mail, as a "spin-off" of ALi.[9] In other respects Wong's account of Richwave's formation is substantially in accord with Pao's. She declared that on January 7, 2004, Richwave "first registered as a Taiwanese company." At that time, she continued, Richwave "was only raising funds and had no operations." According to Wong, Richwave did not commence "active operations" until fundraising was completed at the end of February 2004. She and her team ceased being ALi employees, and became Richwave employees, "on or around March 1, 2004."

Plaintiffs allege that defendants fraudulently concealed the formation of Richwave for some three months after it occurred, thereby "allow[ing] Richwave to receive Plaintiffs' confidential information under the Agreement." They alleged that OEpic "was not informed of these changes regarding the program arrangement and the spin-off[] until . . . April of 2004." It is doubtful that these allegations were adequately substantiated for purposes of the motion to quash service. Pao declared rather vaguely that ALi "did not inform OEpic of the spin-off" until well after it occurred. Wong countered by declaring that "OEpic was fully aware of Richwave's formation as evidenced by the fact that Yi-Ching Pao (OEpic's president) and Ken Tai (OEpic's chairman as well as chairman of a major investor in Richwave named Richtek) mentioned the formation of Richwave in contacts with me during the approximate time period between December 2003 and January 2004."[10] Neither Pao nor Tai contradicted that averment in later declarations. However, in the excerpt of Wong's deposition testimony provided by plaintiffs, she testified only that Pao told her he had heard, apparently from Tai, "that there may be some plan or something," and asked "about the possible new planning."[11] Plaintiffs did not include the next page of the transcript, on

---

[9] In an April 2004 message Wong referred to discussions "[b]efore Richwave's spin-off," and in March 2005 she referred to "March 2004, [when] we spun-off from ALi." In February 2005, Sylvia Hsu, who was apparently attempting to secure more capital for Richwave, also referred to it as "a spin-off from Ali."

[10] We question defendants' assumption that knowledge on the part of a *board member* (here, chairman Tai) may be imputed to the corporation, particularly where the board member has other investments giving rise to interests that potentially conflict with those of the corporation, as Wong's own averment suggests Tai did here.

[11] "Q. When did you tell EpicCom or OEpic that you're no longer with ALi and had become RichWave [*sic*]?

"A. Several times.

"Q. When was the first time?

"A. Hmm. The first time—okay. . . . I think around January or something, okay[.] Dr. Yi-Ching Pao did call me. He call me and he say that he heard that there may be some plan or something[.] Okay, from—from Dr. Ken Tai, okay. He asks me, 'Was there any something going on,' you know 'about the possible new planning?' "

which she may have either recounted her response to Pao's inquiry, or evaded or refused to answer that question. However, defendants did not supply that page either.

### C. *Conclusion of Contracted Services*

Plaintiffs allege that after Richwave was formed, and after OEpic learned of its formation, agents of both Richwave and ALi falsely assured OEpic that it could continue to deliver information to Wong's team because Richwave had assumed, or would assume, ALi's obligations under the design services agreement. In support of these allegations Pao first declared that upon learning of Richwave's formation "[s]ometime in mid-April 2004," OEpic "started to request confirmation of program ownership and final payment from ALi." More specifically he declared that "[i]n May 2004, Yvonne Liu, who was a manager in Wong's group, told Epicom [*sic*][12] that ALi had sold the IP rights specified in the Agreement to Richwave, and that Richwave would take over the Agreement without any changes in terms." Wong attempted to controvert these averments by declaring, "Richwave has never told Epicom [*sic*] that Ali had sold the disputed intellectual property to Richwave. . . . The Plaintiffs' claims that Richwave told Epicom [*sic*] that ALi had sold the disputed intellectual property specified in the relevant Design Services Agreement to Richwave and that Richwave would take over that relevant disputed OEpic-ALi Design Services Agreement are false." Pao later averred more vaguely that at some unspecified time, "while Richwave was still physically part of ALi, Richwave represented to OEpic that it would eventually take over the [design services agreement] for ALi, and that OEpic should continue [in] collaboration under the [agreement] with Wong's design group, which had by then become Richwave."

In July 2004, Liu e-mailed one Darryl Quan at OEpic, "It's with regrets to inform you that RichWave doesn't need the design service from OEpic at current stage." Pao declared that Wong "instructed Epicom [*sic*] to send the final deliverables . . . [,] test reports . . . , and . . . samples . . . to ALi," which OEpic did in early August 2004. According to the complaint, this occurred on August 5, 2004, marking completion of the "program."

On September 13, according to Pao, a manager of ALi's legal department told OEpic "that there would not be any assignment of the Agreement to

---

[12] In this and several other averments, Pao refers to representations made to "Epicom." Pao elsewhere clearly declares that plaintiffs Epic Communications, Inc. (Epic), and EpicCom did not exist until November 2004 and February 2005, respectively. Presumably the use of "Epicom" here is inadvertent, and "OEpic" is intended. Apart from this apparent error, the pervasive reliance by both sides on the fiction of corporate personality—as in averments that statements were made by and to various corporate entities, without identifying the human agents through whom such communications necessarily took place—is troubling.

Richwave, and that ALi would be solely responsible for the terms and obligations of the Agreement." Pao averred that in addition to telling OEpic that Richwave would not take over the agreement, both Richwave and ALi said that Richwave "would not use OEpic's confidential design information." At some point, "ALi also informed OEpic that it would not market OEpic's power amplifiers, and thus would not pay any royalty to OEpic under the [agreement]. Meanwhile, Richwave started to market its own power amplifiers, and claimed that it did not use OEpic's design."

Plaintiffs implicitly allege that Richwave in fact used the fruits of the design services agreement in its products. Their case for this proposition is not plainly laid out, and presumably much of it is highly technical. But one nontechnical aspect apparently concerns parallels and coincidences in time concerning dealings between Wong's design team and an entity named Acer Laboratories, Inc., USA, also known as ALi-USA, presumably an American affiliate of ALi. Plaintiffs submitted a declaration by Ssu-Pin "Simon" Ma, a former employee of ALi-USA, who averred that from at least 2002 until July 2004, Wong's Taiwan team had been involved in a joint development project with an RF design group employed by ALi-USA, of which he was a member. Although the declaration neglects to mention exactly where the ALi-USA team was located, it does support an inference that the declarant, at least, lived or worked in the general vicinity of San Francisco, because in 2004 he was an officer of the San Francisco chapter of an engineering society. In early 2004, the members of the ALi-USA team were told that Wong's Taiwan team had spun off to form Richwave, and that their group would also be spun off and merged into Richwave. The record contains a formal agreement between Richwave and ALi Microelectronics Corp. USA contemplating the latter's providing design services to the former commencing March 1, 2004, "in the territory of the United States." This plan proceeded far enough that ALi-USA team members were given e-mail addresses in Richwave's Taiwan Internet domain, i.e., richwave.com.tw. However, in May or June of 2004—near the end of OEpic's delivery of design information under its agreement with ·ALi—the American team members were told that Richwave would not be absorbing their design group, and that instead, "[t]he entire ALi USA would be dissolved." Plaintiffs apparently infer from this that Richwave, having secured the basis for a workable design from OEpic through ALi, no longer required the engineering services the ALi-USA team had been expected to provide.[13]

---

[13] Wong attempts to cast this inference in doubt by noting that a patent application attached to Ma's declaration is concerned with "CMOS transceiver design," a project she describes as having been completed before Richwave was formed, and as being "completely unrelated to the technology allegedly misappropriated." But this misses the point of Ma's declaration, which is admittedly somewhat obscured by the attachment of the patent materials. The only apparent relevance of the patent was to substantiate one of many California contacts asserted

### D. *Formation of Epic and EpicCom*

Pao declared that in November 2004, plaintiff Epic "was incorporated in Taiwan . . . and became OEpic's successor-in-interest to all technology and business contracts relevant to the instant actions."[14] A few days later, Epic "registered to conduct intrastate business in California." On February 15, 2005, Epic in turn formed plaintiff EpicCom, Inc. (EpicCom), "a wholly owned California subsidiary" with its registered address at the same Bordeaux Drive location as OEpic's former offices. Plaintiffs allege that EpicCom "is either a licensee or co-owner of Epic's intellectual property rights at issue in this case."

### E. *Proceedings*

This action was originally filed in December 2006, on behalf of Epic only. EpicCom was joined as a plaintiff by amended complaint about four months later. Two and a half months after that plaintiffs filed their second amended complaint, which was the operative pleading at the time of the ruling on the motion to quash. Its first cause of action names only ALi as a defendant and only Epic as a plaintiff. It alleges that ALi breached both the nondisclosure agreement and the design services agreement "by allowing Richwave to access and use Epic's [*sic*] confidential information," as a result of which "Epic has suffered economic loss . . . ."

The second cause of action alleges that all defendants committed fraud by (1) concealing Richwave's formation, and (2) falsely representing that Richwave "would eventually take over the [design services agreement] for ALi." OEpic detrimentally relied on these representations and omissions by continuing to deliver design information to Richwave under that agreement. After Richwave refused to assume the agreement, defendants made the further misrepresentation that "ALi and Richwave would not use OEpic's confidential information[,] while they knew that Richwave would indeed use the information without OEpic's consent." OEpic detrimentally relied on this representation by "not tak[ing] any legal action against ALi's disclosure of OEpic's confidential information to Richwave at the closure of the Agreement." This "allowed Richwave time to develop its derivative and competing products using OEpic's confidential design information."

by plaintiffs as grounds for jurisdiction that are not directly related to this controversy. Wong's declaration does nothing to dispel the more telling point of Ma's declaration, which is that upon securing OEpic's design materials, Wong and Richwave abruptly abandoned their previous intention to engage the ALi-USA team for RF design services.

[14] Whatever remained of OEpic was "merged into OEpic Semiconductor, Inc., a Delaware corporation."

The third cause of action charges all defendants with misappropriation of trade secrets, in that "Richwave and Wong acquired the confidential design information through improper means, and are not authorized to use such confidential information for their own benefit."

The fourth cause of action charges all defendants with civil conspiracy in that they agreed, at unspecified times, "to help Richwave acquire OEpic's trade secrets and know-how fraudulently through the Agreement," "to allow Richwave to develop its competing PA's and LPA's using OEpic's confidential design information," to avoid "transfer[ring] the [design services agreement] from ALi to Richwave" in order to shield both from liability, and "to defraud OEpic by denying Richwave's use of OEpic's confidential information."

The fifth cause of action charged that all of the conduct described in the complaint constituted unfair competition in violation of Business and Professions Code section 17200 et sequitur, unjustly enriching defendants and entitling plaintiffs to restitution.

Defendants Wong and Richwave moved to quash service on the ground that they lacked sufficient contacts with California to be subject to service here. After multiple continuances, the trial court heard and granted the motion. Plaintiffs filed a timely notice of appeal. (See Code Civ. Proc., § 904.1, subd. (a)(3).)

DISCUSSION

## I.  The Minimum Contacts Test

On a motion to quash for lack of personal jurisdiction, the plaintiff bears the burden of establishing by a preponderance of the evidence that the defendant has such " 'minimum contacts' " with the forum state that being subjected to its jurisdiction will not offend traditional notions of fair play. (*DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080, 1089–1090 [128 Cal.Rptr.2d 683].) To the extent this question turns on issues of fact, it is entrusted to the trial court, whose resolution of those issues will not be disturbed if supported by substantial evidence. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 [58 Cal.Rptr.2d 899, 926 P.2d 1085].) Insofar as the question presents issues of law, such as the jurisdictional sufficiency of the contacts impliedly or necessarily found by the trial court, it will be subject to independent review on appeal. (*Ibid.*; *VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc.* (2002) 99 Cal.App.4th 228, 234, fn. 1, 243–244 [121 Cal.Rptr.2d 1].)

■ "Under the minimum contacts test, 'an essential criterion in all cases is whether the "quality and nature" of the defendant's activity is such that it is "reasonable" and "fair" to require him to conduct his defense in that State.'" (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 268 [127 Cal.Rptr.2d 329, 58 P.3d 2] (*Pavlovich*), quoting *Kulko v. California Superior Court* (1978) 436 U.S. 84, 92 [56 L.Ed.2d 132, 98 S.Ct. 1690], quoting *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316–317, 319 [90 L.Ed. 95, 66 S.Ct. 154].) This criterion gives rise to two forms or categories of personal jurisdiction: general and specific. (*Vons Companies, Inc. v. Seabest Foods, Inc., supra*, 14 Cal.4th at p. 445.) General jurisdiction exists where the defendant has such pervasive contacts with the forum state that it is fair to subject it to jurisdiction for all purposes. (*DVI, Inc. v. Superior Court, supra*, 104 Cal.App.4th at pp. 1090, 1097.) Here, plaintiffs do not challenge the trial court's conclusion that Richwave and Wong lack sufficient contacts with California to be subject to its general jurisdiction. We are therefore concerned only with the sufficiency of their California contacts to establish specific jurisdiction.

■ Specific jurisdiction exists when, though the defendant lacks such pervasive forum contacts that he may be treated as present for all purposes, it is nonetheless proper to subject him to the forum state's jurisdiction in connection with a particular controversy. "When determining whether specific jurisdiction exists, courts consider the '"relationship among the defendant, the forum, and the litigation."' [Citation.] A court may exercise specific jurisdiction over a nonresident defendant only if: (1) 'the defendant has purposefully availed himself or herself of forum benefits' [citation]; (2) 'the "controversy is related to or 'arises out of' [the] defendant's contacts with the forum"' [citation]; and (3) '"the assertion of personal jurisdiction would comport with 'fair play and substantial justice'"' [citation]." (*Pavlovich, supra*, 29 Cal.4th at p. 269.)

In its order granting the motion to quash, the trial court did not address the question whether plaintiffs had demonstrated the purposeful availment and forum relatedness required to subject Wong and Richwave to specific jurisdiction. After holding that there were insufficient contacts for general jurisdiction, the court concluded that the third requirement for specific jurisdiction was lacking in that it would be "unreasonable" to exercise jurisdiction over Wong and Richwave. Because we cannot accept the trial court's treatment of this issue, we must address the first two requirements as well. We therefore proceed to do so.

II.  *Purposeful Availment and Forum Relatedness*

The first two conditions for special jurisdiction are adequately established by evidence that Wong (1) signed the nondisclosure agreement, which made

possible the negotiations culminating in the design services agreement, (2) participated materially in those negotiations, including at least two important meetings in California with OEpic representatives, and (3) headed the formation and operation of an enterprise (Richwave) that thereafter acquired ALi's rights under that agreement.

The first two facts are not effectively disputed and may be indisputable. There is no doubt that Wong signed the nondisclosure agreement and was physically present in California at least twice, and probably three or more times, for discussions that ultimately gave rise to the design services agreement. As previously noted (see fn. 1, *ante*) her own account is rather vague; but she acknowledges visiting OEpic's offices in November 2002 and January 2003. Cindy Yuen, an engineer then employed by OEpic, declared that Wong visited OEpic's Sunnyvale offices "a few times" in this connection, specifically including a meeting on August 23, 2002—eight days after execution of the nondisclosure agreement—and a "lengthy" meeting on November 13, 2002, at which, Yuen declared, she and Wong "reached the agreement on most items in this partnership, which eventually became the framework of the Design Service Agreement." To the extent Wong's account seems at first blush to cast doubt on these averments, it proves so ambiguous and qualified, on closer scrutiny, as to be virtually irrelevant.

In contrast to the showing on these points, there is no direct and unequivocal evidence in this record that Richwave acquired ALi's rights under the design services agreement. But positive evidence on that subject would presumably be under defendants' control, and they offer only Wong's naked and pregnant denial that Richwave ever *told* Epic or its predecessor that ALi had "sold" its rights under the agreement to Richwave.[15] Apart from that denial, all competent evidence appears to favor plaintiffs. Thus the record includes an e-mail from "Yvonne" at Richwave to an apparent Richwave investor, explaining a cost item she had described in a financial report as a " 'Royalty Payment.' " She noted that this represented "the initial payment of IPs [intellectual property] purchase[d] from ALi," adding, " 'Royalty' may not be the correct term here as RichWave has bought out *all IP rights.*" (Italics added.) In addition, Pao declared that an agreement between ALi and Richwave concerning the transfer of intellectual property to the latter by the former "included IP on power amplifiers, which is Epic's IP conveyed to ALi under the [design services agreement]." This averment, though probably

---

[15] "Richwave has never told Epicom [*sic*] that Ali had sold the disputed intellectual property to Richwave. . . . The Plaintiffs' claims that Richwave told Epicom [*sic*] that ALi had sold the disputed intellectual property specified in the relevant Design Services Agreement to Richwave and that Richwave would take over that relevant disputed OEpic-ALi Design Services Agreement are false."

vulnerable to objection on hearsay or foundational grounds, was not objected to in the trial court.[16] Nor was it effectively disputed.

The question thus becomes whether a Taiwan resident, who enters a nondisclosure agreement with a California business on behalf of her then employer, and who then comes to California and negotiates an agreement on behalf of that employer contemplating the ongoing performance of services in California by the California business, may fairly be required to defend against allegations that she and an entity thereafter formed by her have aided the former employer in misappropriating the fruits of that agreement while refusing to perform any of the obligations imposed by it in favor of the California business. We have little doubt that this question should be answered affirmatively. Wong's coming to California to negotiate the design services agreement, and her execution of the nondisclosure agreement in anticipation of those discussions, certainly constitute purposeful availment by her of the privilege of doing business in this state, and her subsequent creation of an entity that acquired ALi's rights under the design services agreement made it eminently foreseeable that she, and it, would be embroiled in any California litigation arising from alleged nonperformance of that agreement. The situation is equivalent to one where a managerial employee of a foreign corporation comes to California, induces a California business to sell oranges to the employee's overseas employer, and thereafter sets up a business selling the oranges overseas while both she and her former employer refuse to pay the California business for them. We see no reason to suppose that the former employee should not expect to answer in California for the dispute she was so intimately involved in generating.

■ Defendants repeatedly implied to the trial court that Wong's contacts with "the California operations of OEpic" could be disregarded because they were undertaken "strictly in her role as an employee of co-defendant ALi." At an early hearing the court expressed some inclination toward this view.[17] It is certainly true that an agent is not ordinarily *liable* on contracts he executes on behalf of a disclosed principal. (3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and Employment § 196, pp. 248–249; Rest.3d Agency, § 6.01.) But local substantive law concerning liability does not control the jurisdictional analysis, which at bottom is concerned with " 'fair play and substantial justice.' " (*International Shoe Co. v. Washington, supra*, 326 U.S. 310, 316;

---

[16] The averment appears as follows: "One of the redacted parts of the IP Purchase and Transfer agreement [between ALi and Richwave] is the contents of the IP transferred. Epic's Taiwanese lawyer saw the redacted portion in [a Taiwan] Court and indicated to the Court that the contents of the transferred IP included IP on power amplifiers, which is Epic's IP conveyed to ALi under the [design services agreement]."

[17] "I don't know that I can deny the motion to quash on behalf of Ms. Wong because as I understand it, she was doing whatever she did[—]the negotiations, discussions regarding trade secrets[—]on behalf of ALi."

see *Anglo Irish Bank Corp., PLC v. Superior Court* (2008) 165 Cal.App.4th 969, 983, fn. 13 [81 Cal.Rptr.3d 535] [noting "the inexact fit between rules of law designed to establish liability for the acts of another and an assessment of the defendant's contacts with the forum for purposes of establishing general or specific personal jurisdiction"].) Thus "[a]n individual's status as an employee acting on behalf of his or her employer does not insulate the individual from personal jurisdiction based on his or her forum contacts." (*Anglo Irish Bank Corp., PLC*, at p. 981, citing *Calder v. Jones* (1984) 465 U.S. 783, 790 [79 L.Ed.2d 804, 104 S.Ct. 1482] (*Calder*); see *Keeton v. Hustler Magazine, Inc.* (1984) 465 U.S. 770, 781, fn. 13 [79 L.Ed.2d 790, 104 S.Ct. 1473] (*Keeton*).) Some jurisdictions have held otherwise, adopting a "fiduciary shield" doctrine to exempt some foreign agents from local jurisdiction, but these holdings have been criticized and explicitly rejected in other jurisdictions, including California. (See *Taylor-Rush v. Multitech Corp.* (1990) 217 Cal.App.3d 103, 114–118 [265 Cal.Rptr. 672], and cases cited.) That a "fiduciary shield" doctrine is not compelled by the federal Constitution is strongly if not conclusively indicated by *Calder* and *Keeton*.

■ The situation is somewhat more complicated with respect to Richwave, which *did not exist* at the time of Wong's early California contacts from which the litigation arose. Nor is there any clear evidence that Richwave, through its agents, has ever been present in California in connection with any matter giving rise to this dispute.[18] "Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 476 [85 L.Ed.2d 528, 105 S.Ct. 2174].)

Here, if Richwave indeed assured OEpic that it would assume ALi's obligations under the agreement, it had ample ground on that basis alone to "reasonably anticipate being haled into court" in this state. (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 [62 L.Ed.2d 490, 100 S.Ct. 559].) Pao declared that Richwave gave just such assurances. He

---

[18] Plaintiffs appear to contend that Richwave has had dealings with various California entities, and has had other California contacts, involving the ongoing misuse, or attempted misuse, of the intellectual property provided by OEpic. In essence they assert that Richwave markets or attempts to market products wrongfully incorporating that technology into California, or into the hands of those who will market such products into California. We find it unnecessary to consider these alleged contacts in order to resolve the jurisdictional issue.

averred that upon learning of Richwave's formation "[s]ometime in mid-April 2004," OEpic "started to request confirmation of program ownership and final payment from ALi." In one declaration he averred that "while Richwave was still physically part of ALi, Richwave represented to OEpic that it would eventually take over the [design services agreement] for ALi, and that OEpic should continue [in] collaboration under the [agreement] with Wong's design group, which had by then become Richwave." In another, he declared more specifically, "In May 2004, Yvonne Liu, who was a manager in Wong's group, told Epic[] that ALi had sold the IP rights specified in the Agreement to Richwave, and that Richwave would take over the Agreement without any changes in terms."

As noted above, Wong attempted to controvert these averments by declaring, "Richwave has never told Epicom [sic] that Ali had sold the disputed intellectual property to Richwave. . . . The Plaintiffs' claims that Richwave told Epicom [sic] that ALi had sold the disputed intellectual property specified in the relevant Design Services Agreement to Richwave and that Richwave would take over that relevant disputed OEpic-ALi Design Services Agreement are false." Apart from the several adverse inferences with which this denial remains pregnant, it is gravely weakened by its limitation to what Richwave told Epic ("EpicCom"), an entity that did not exist at the relevant time, and plaintiffs' reference to which in the denied averment was an obvious mistake. Further, Pao had not declared that the representations were made by "Richwave" but by a named human agent named Yvonne Liu. Defendants cannot effectively controvert that averment by retreating into the fiction of corporate personality, without providing any basis in personal knowledge or offering any explanation for the silence of the person to whom the statement was attributed. Moreover, some support for the averment—albeit weak and equivocal—appears in a July 2004 e-mail from Liu herself, who wrote apologetically to one Darryl Quan at OEpic, "It's with regrets to inform you that RichWave doesn't need the design service from OEpic at current stage." Pao declared that Wong thereafter "instructed Epicom [sic] to send the final deliverables . . . [,] test reports . . . , and . . . samples . . . to ALi," which OEpic did in early August 2004. But by then, according to plaintiffs, OEpic had already supplied the bulk of the "deliverables" to Wong's design team, either while it remained under ALi's employ, or after it became employed by Richwave, in the belief that Richwave had assumed or would assume ALi's obligations. Since there is no effective contradiction of plaintiffs' showing that agents of Richwave induced this conduct, we find its contacts with California sufficient to sustain jurisdiction over it.[19]

---

[19] This conclusion makes it unnecessary to consider the extent to which Wong's California activities prior to the formation of Richwave might be imputed to Richwave for jurisdictional purposes even though it did not yet exist when they occurred.

III. *Plaintiffs' Relation to the Action*

A. *EpicCom*

The trial court did not address any of the foregoing questions. It reasoned that whether or not the first two conditions for specific jurisdiction were present (purposeful availment and forum relatedness), the motion to quash was well taken because "defendants presented a compelling case that it would be unreasonable to exercise jurisdiction over them." This was presumably a finding that plaintiffs had failed to establish the third condition for specific jurisdiction, i.e., that " ' "the assertion of personal jurisdiction would comport with 'fair play and substantial justice' " ' . . . ." (*Pavlovich, supra,* 29 Cal.4th at p. 269.) In so concluding the court "highlight[ed]" the facts that (1) "of the two plaintiffs and three defendants named as parties to this action, only one party is a California resident (plaintiff EpicCom, Inc.), while all others are residents of Taiwan," and (2) "EpicCom, Inc.'s connection to this case [is] tangential at best in that the company did not even come into existence until February 2005 . . . , after the wrongful acts complained of were committed."

Plaintiffs raise three points in opposition to this analysis. Two are aimed at the court's characterization of EpicCom's connection to this action as "tangential." The third is aimed at the court's failure to recognize the significance of plaintiffs' asserted status as successors to, and assignees of, OEpic's rights against defendants. We reject the first two objections but find merit in the third.

The court's finding that EpicCom's interest in this matter was "tangential at best" finds support on the face of plaintiffs' own pleadings. EpicCom was not even originally joined as a plaintiff, but was only added in the first amended complaint. That pleading lacked any allegation that EpicCom, as distinct from Epic, had suffered any *damage*.[20] It also pervasively referred to the trade secrets at issue as belonging to Epic. These deficiencies were largely corrected in the second amended complaint, but that pleading did nothing to flesh out the allegations concerning *EpicCom's legal interest* in this matter. In the first amended complaint, EpicCom was described only as "a fully owned *subsidiary* of Epic[]," and "*either a licensee or co-owner* of Epic[]'s intellectual property rights at issue in this case." (Italics added.) The second amended complaint alleges that EpicCom is a "fully owned subsidiary of *OEpic*," but

---

[20] In the four counts where damages were specifically alleged, plaintiffs asserted that "Epic[] has suffered economic loss," "Defendants' acts have caused Epic[] damages," "Defendant's [*sic*] conspiracy has caused Epic[] economic damages," and "Epic[] has suffered injury to its business . . . ." The prayer, too, omits any reference to EpicCom: "WHEREFORE, Epic[] prays for relief against Defendants as follows: . . ."

aside from being legally irrelevant, this is clearly a drafter's error, since OEpic is described immediately thereafter as a "merged *and defunct* Delaware corporation," and the complaint goes on to reiterate a previous allegation that *Epic* "took over all the assets and liabilities of OEpic in the [PA] and [LPA] businesses," and thereafter formed EpicCom as "a wholly owned California subsidiary." (Italics added.) Plaintiffs also reiterate that "EpicCom is either a licensee or co-owner of Epic's intellectual property rights at issue in this case." While most of the counts have been amended to allege that "plaintiffs" sustained damage, the first—for breach of contract—bears the heading "Epic vs. ALi," and alleges only that "Epic has suffered economic loss . . . ." The exclusion of EpicCom from this count is bewildering, since if it were truly a co-owner, assignee, or successor to OEpic's rights under the development agreement, it would presumably have as strong a contract claim as Epic does. Instead, inexplicably it is joined only in the causes of action sounding in tort, misappropriation of trade secrets, and unfair competition.

Nor are these gaps filled by plaintiffs' evidentiary showing. In opposition to a motion by ALi to abate this action, Pao declared that he was the president and general manager of both Epic and EpicCom, as well as president and chief executive officer of OEpic "when it was in operation." He described Epic as "a spin-off of OEpic," but as we have noted (see fn. 8, *ante*), that term has acquired an exceptionally vague meaning, and suggests nothing in particular about any succession to rights or liabilities. Somewhat more to the point was Pao's averment that Epic "was incorporated in Taiwan on November 16, 2004, and became OEpic's successor-in-interest to all technology and business contracts relevant to the instant action." But no such averment is made with respect to EpicCom. In an early declaration Pao merely echoed EpicCom's description in the first amended complaint as "a wholly owned subsidiary corporation" of Epic that "has become a *licensee and/or co-owner* of all [Epic's] technologies at issue in this case." (Italics added.) He further declared that upon the formation of EpicCom, "Epic[] ceased conducting any intrastate business in California," and "[a]ll of Epic[]'s *California businesses* are now *handled through* EpicCom . . . ." (Italics added.)

■ None of these averments establish that EpicCom has any enforceable interest in the matters alleged in the complaint. Read liberally, they indicate that (1) EpicCom is a subsidiary of Epic; (2) EpicCom is an agent of Epic for purposes of handling its California "businesses"; and (3) EpicCom is "a licensee and/or co-owner" of the rights sued upon by Epic. Obviously a subsidiary, as such, has no stake in the rights and claims of its parent, any more than the parent has a stake in the claims of its shareholders. There may of course be situations where the subsidiary and parent both have claims

arising out of the same set of facts, but neither will have a claim arising merely from the fact of their relationship.

Nor does an agent ordinarily have a cause of action based upon some third person's violation of its principal's rights. Without some breach of a duty owed *to him*, it has no power to sue on the principal's claim. (See Code Civ. Proc., § 367 [suit to be brought in name of real party in interest]; cf. Civ. Code, § 1559 [power to sue on contract of which plaintiff is an express third party beneficiary].)

This leaves the averment that EpicCom is a "licensee *and/or* co-owner of all [Epic's] technologies at issue in this case." Undoubtedly the *co-owner* of a property interest may complain of harm done to that interest. Indeed it may be an indispensable party in any action for injury to that interest. But to allege such status disjunctively with that of a *licensee* deprives it of legal force as a basis for asserting a claim. A licensee, as such, has no more right to sue upon a violation of the licensor's rights by a third party than an apartment dweller has to complain of his neighbor's arrearage in rent. The quoted allegation is the equivalent of saying, "Plaintiff has a cause of action and/or he does not." Such an assertion is legally, not to mention logically, vacuous.

Only in their civil conspiracy cause of action do plaintiffs positively assert an enforceable interest in EpicCom, and there the point is stated in a curiously passive and conclusory manner: "The trade secrets at issue are jointly owned by Plaintiffs." This allegation may be viewed with considerable skepticism in light of the equivocation reflected in other allegations on the same subject. In any event, mere allegations are not enough. The complaint is no substitute for *evidence* in opposing a motion to quash. (See *Ziller Electronics Lab GmbH v. Superior Court* (1988) 206 Cal.App.3d 1222, 1233 [254 Cal.Rptr. 410] ["An unverified complaint may not be considered as an affidavit supplying necessary facts."].) We discuss plaintiffs' pleadings in connection with EpicCom's connection to this action because their very vagueness on this subject invites an inference that EpicCom does *not* have an enforceable interest in the rights at issue.

Nor do plaintiffs' proofs do anything to remove this cloud of doubt. Apart from the fatally disjunctive statement discussed above, the only averment we can find addressing EpicCom's interest in the subject matter is Pao's averment that at some unspecified time, and by some unspecified means, "EpicCom took over all the assets of OEpic in the wireless technology, including its contracts with defendant ALi." But this averment is rendered useless by a preceding recital that Pao is using "EpicCom" to refer "collec-

tively" to both Epic and EpicCom. In a later declaration he averred that *"Epic is the corporate successor to the power amplifier business of OEpic, Inc."* But he nowhere positively asserted that *EpicCom*, as distinct from Epic, had any enforceable legal interest in the subject matter of the suit.

In view of this woeful demonstration we can find no fault in the trial court's characterization of EpicCom's "connection to this case" as "tangential at best . . . ." Plaintiffs respond to this point in part by asserting, without record citation, that "OEpic *assigned* the cause of action to its successors in interest, Epic and EpicCom." (Italics added.) But we see no reference to any assignment in any of the proofs below. And while the record may be understood to establish that *Epic* acquired OEpic's rights by corporate succession or transfer, it cannot be so understood with respect to Epic's subsidiary, EpicCom. Rather the record is redolent with the inference that EpicCom was joined solely because its California residence was thought to add weight to the jurisdictional showing plaintiffs needed to survive defendants' motion to quash.

Plaintiffs also suggest that defendants are "attempt[ing] to create confusion by questioning EpicCom's status as a co-owner of the trade secrets at issue." They assert that defendants "have never disputed that fact until now" and did not contest the averments offered below to establish it. This is not entirely true. Defendants were clearly referring to EpicCom when they wrote, on the first page of their original memorandum in support of the motion to quash, that "all but one *irrelevant party*" in the action are based in Taiwan. On the next page they acknowledged plaintiffs' "claim" that "they are successor[s] to dissolved OEpic and have inherited various causes of action," but added, "Richwave and Wong fully reserve the right to dispute this issue and other standing-related issues." Later, in a reply memorandum, defendants wrote that plaintiffs had not "sufficiently established that Plaintiffs even have standing to assert the purported trade secrets." (Italics added.)

Moreover it was the trial court who questioned EpicCom's relevance to this case, and it manifestly did so because on the face of the pleadings and proofs EpicCom had only a vague connection to the matter. If plaintiffs were truly surprised by the court's skeptical view of their "proofs of succession," they should have sought relief in that court, if only to make a better record on the issue. As it is the court quite correctly perceived that EpicCom's relation to this suit was peripheral at best and thus had no direct bearing on the minimum contacts question.

## B. *Epic*

Although the trial court properly discounted EpicCom's California residency on the ground that it lacked any demonstrated connection to the causes of action asserted in the complaint, it erred in supposing that the Taiwan residency of the remaining parties justified a conclusion that it would be unreasonable to exercise jurisdiction in California. The court assumed that defendants would be subject to California jurisdiction if the action had been brought by OEpic—the original owner of the rights at issue—but that the transfer of those rights to a foreign plaintiff, i.e., Epic, rendered the exercise of jurisdiction by California courts unreasonable.

■ We cannot accept this view. The governing precedents from the United States Supreme Court make it plain that the "constitutional touchstone" for personal jurisdiction is "whether the *defendant* purposefully established 'minimum contacts' in the forum State." (*Burger King Corp. v. Rudzewicz, supra*, 471 U.S. 462, 474, italics added.) Where this condition is met—as the trial court assumed, and we have found, it is met here—the defendant may "defeat jurisdiction" only by presenting "a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable." (*Id.* at p. 477, italics added.) The Supreme Court has given examples of the factors that may bear on the reasonableness of asserting jurisdiction, i.e., " 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.' " (*Ibid.*, quoting *World-Wide Volkswagen Corp. v. Woodson, supra*, 444 U.S. 286, 292.) We fail to see how the non-California residency of plaintiff can make a "compelling case" with respect to any of these factors. Conceivably "the forum State's interest in adjudicating the dispute" is diminished if none of the parties are residents of that state. But to hold this factor sufficiently compelling to prevent the assumption of jurisdiction is to discriminate rather starkly against non-California plaintiffs. ■ Moreover, while the current holder of the rights at issue is not a California resident, the fact remains that the original conduct giving rise to the suit was directed at a California business. This state retains an interest in securing a remedy for wrongs done here, even if the victim is not, or has ceased to be, a Californian.

■ Further, it seems to us that while a state may be free to adopt statutes or rules *disclaiming* jurisdiction based upon a perceived lack of interest in disputes between nonresidents, that factor can take on *constitutional* signifi-

cance only if it is so obviously attenuated *at the outset* that it affects the foreseeability of the defendant's being " 'haled into court there.' " (*Burger King Corp. v. Rudzewicz, supra,* 471 U.S. at p. 474, quoting *World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S. at p. 297.) Thus if two residents of Taiwan happen to meet at a California resort and negotiate an agreement to be performed entirely in Taiwan, both might reasonably suppose that California had no interest in adjudicating a dispute arising out of that agreement, even if their activities here in negotiating the contract would otherwise sustain jurisdiction over both of them. But here defendants all dealt directly with a California corporation at the time of the contacts giving rise to jurisdiction. Their dealings involved services to be performed entirely in California, in the sense that the work was done here, the workers resided here, and the compensation would be received here. None of the defendants had any reason to anticipate that a dispute under the agreement would be adjudicated anywhere but in California. Indeed the agreement explicitly required disputes to be resolved in California—specifically, Santa Clara County—applying California law. Nor did defendants have any reason to anticipate that the plaintiff in any such controversy would be anybody other than the California enterprise with which they dealt. The later transfer of that entity's rights to a Taiwan corporation could have no bearing on the foreseeability, at the time of the conduct giving rise to the suit, of their being haled into court. So far as they knew, it was entirely predictable that if the agreement were not performed, or a dispute arose over the disposition of its fruits, they would be haled into court—or at least into arbitration—in California. That the plaintiff that eventually sued them was itself a Taiwan corporation was, from their perspective, a pure fortuity. That fact does not furnish a compelling basis for holding California jurisdiction unreasonable.

Further, insofar as California may be said to have an interest in avoiding the burden on its public facilities of entertaining litigation in which none of its residents has any immediate stake, it must be recalled that the dismissal of Wong and Richwave would not terminate this action, but only guarantee the continuation of the multiple suits already pending among the parties here and in Taiwan. That ALi is subject to California jurisdiction has never been disputed, and the suit against it will presumably continue no matter what happens to Wong and Richwave. It is therefore impossible to say that the added burden of entertaining claims against Wong and Richwave is so inimical to the state's interests as to militate significantly against the exercise of jurisdiction over them.

## DISPOSITION

The order quashing service of process is reversed.

Premo, J., and Elia, J., concurred.

A petition for a rehearing was denied December 15, 2009, and respondents' petition for review by the Supreme Court was denied February 18, 2010, S178753.