[No. B068424. Second Dist., Div. Seven. Feb. 24, 1993.]

CHECKER MOTORS CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES, Respondent;
JOHN GARAMENDI, as Insurance Commissioner, etc., Real Party in
Interest.

COUNSEL

Armato, Gaims, Weil, West & Epstein, Alan Jay Weil, Barry G. West, Peter L. Steinman and Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti for Petitioners.

Rubinstein & Perry, Karl L. Rubinstein, Robert W. Biederman, Kathleen M. McCain and Charles S. Bronitsky for Real Party in Interest.

OPINION

JOHNSON, J.—In this case we issued an order to show cause for the purpose of considering whether a California insolvency court properly assumed personal jurisdiction over an out-of-state partnership and its general partner. These entities had solicited and negotiated a substantial investment from a California insurance company. In return they made the California insurer the sole limited partner in this out-of-state partnership. The general partner terminated this limited partnership interest four years later because California appointed a conservator for the insurance company. We conclude

the out-of-state entities had sufficient contacts with California during these transactions to satisfy due process and confer personal jurisdiction on the trial court. Accordingly, we deny the petition for writ of mandate which the out-of-state entities filed.

FACTS AND PROCEEDINGS BELOW

While this writ proceeding concerns a recent, limited issue of personal jurisdiction, the underlying litigation arises out of the 1980's and an insurance company's days as a funder of "leveraged buyouts," among other things. Executive Life Insurance Company of California (ELIC), a California corporation, was the insurance company. Real party in interest, the Insurance Commissioner of the State of California, is now the conservator of that company.

In 1985, a small group of investors proposed a leveraged buyout of the Checker Motors Company and its subsidiaries in order to transform the company from a publicly traded corporation into a privately held entity. (Checker Motors Company was a New Jersey corporation headquartered in Michigan. It was an auto manufacturer, taxi franchisor, and property and casualty insurer.) The buyout group included members of the board of the original Checker Motors Company corporation (one of whom was an officer of the corporation) and of Executive Life Insurance Company of New York (ELNY), a wholly owned subsidiary of ELIC. In order to facilitate the leveraged buyout they formed Checker Holding Corporation (CHC), a Delaware corporation. The purpose of CHC was to assemble additional financing for the venture and to negotiate the leveraged buyout with Checker's outside directors.

CHC retained Paine Webber, Inc., to seek institutional investors. Among other places, Paine Webber sought such investors in California. It ultimately located ELIC as a prospective major investor in the buyout. ELIC, in turn, retained James Cox III and his business, Sallis Securities, Co., a California company, to negotiate the terms of its participation. The negotiations took place between Paine Webber and CHC in New York, and Cox, acting for ELIC, in California. Most of the negotiations were carried out by telephone and correspondence.

The arrangement which the two sides worked out called for ELIC to purchase a senior subordinated note for $5 million and to acquire for $250,000 a limited partnership in a new entity, Checker Motors Co., L.P. (Checker LP), a Delaware limited partnership. This new entity was to own and operate the businesses of the former Checker Motors Company. These

businesses were and are centered in Michigan. The only other partner in Checker LP was to be Checker Motors Corporation (Checker), a New Jersey corporation, with its principal place of business in Michigan, which was to function as the general partner. Checker, in turn, was owned and controlled by the individual investors in the buyout group.

Cox first signed a letter of intent for ELIC's participation. This letter was signed in California. Later on Barbara Pokart, one of Cox's attorneys, signed the senior subordinated note purchase agreement in California. Ultimately, with all negotiations completed to everyone's satisfaction, Fred Carr, who headed ELIC, executed the partnership agreement for participation in Checker LP, once again signing it in California. All payments on the note and distributions for ELIC's interest in Checker LP have been sent to ELIC in California. After ELIC made this investment and entered this partnership at least one meeting was held in California between representatives of Checker, the general partner, and ELIC, the limited partner. This investment proved very profitable to ELIC over the next few years. The $5 million note was paid off in less than two years with 14 percent interest. Meantime the ELIC's partnership share in Checker LP returned extraordinary profits. Under the partnership agreement, ELIC was entitled to 90 percent of the partnership's net profits for the first five years or until its capital account reached $40 million, whichever occurred first. The $40 million level was reached in less than four years. Thereafter, ELIC's profit share declined to 10 percent. Even then, however, ELIC's capital account continued to grow at an average approaching $2.5 million a year.

Unfortunately for ELIC, however, many of its other investments proved less than successful. On April 11, 1991, the superior court issued a conservation order appointing the insurance commissioner the conservator for ELIC and placing all of ELIC's real and personal property in the court's custody. The order likewise enjoins anyone from filing or prosecuting lawsuits—or taking other actions—against ELIC or the conservator in any other jurisdiction.

Less than a month later, Checker and Checker LP sent a letter informing ELIC the conservation order represented an event of default under the partnership. As a result, they were freezing ELIC's capital account as of the date of the conservatorship. Thus ELIC's partnership share would not be entitled to a share of Checker LP's future earnings and the conservator would only receive a payout in installments of that final capital account. Meantime a new corporation, Checker Holding III, was created to become Checker's sole limited partner in Checker LP. This was done despite a provision in the partnership agreement requiring ELIC's approval of any new partners.

The conservator responded to petitioners' letter, objecting to the termination of ELIC's partnership interest and to the substitution of a new limited partner. Among other things, the conservator pointed out so-called "ipso facto" provisions such as the "event of default" clause petitioners sought to invoke have been declared invalid by some courts.

In order to obtain judicial approval of its unilateral action, on July 8, 1991, Checker LP filed an action in the Delaware courts. This action sought a declaration ELIC had defaulted on the partnership agreement when a conservator was appointed and, further, that this default meant it no longer was entitled to share as a limited partner in Checker LP's profits. The California insurance commissioner opposed this lawsuit on the ground jurisdiction properly belonged with the California courts. On February 13, 1992, the Delaware court dismissed Checker LP's action, explaining:

"Because no ancillary receiver has been appointed in Delaware, [18 Del. C.] sec. 5916(a) requires that this action be brought in the domiciliary state, which is California."[1]

The Checker entities did not follow the Delaware court's suggestion that jurisdiction for its action belonged in the California courts. Instead on March 20, 1992, they filed a proof of claim with the Michigan ancillary receiver (who is the Michigan insurance commissioner) pursuant to the Uniform Insurance Liquidation Act (UILA). Checker brought the action under California Insurance Code section 1064.4, subd. (a). The Michigan insurance commissioner had been appointed as ancillary liquidator for ELIC assets located in that state on October 3, 1991, and according to the Michigan Insurance Code became the ancillary receiver as well. (Mich. Ins. Code, § 500.8151 ["If a domiciliary liquidator is appointed in a reciprocal state while a liquidation is proceeding under this section, the liquidator under this section shall thereafter act as ancillary receiver."].)

On March 23, 1992, three days after filing the claim in the Michigan courts, the Checker entities filed a motion to quash service of summons in the instant action, that is, the California insurance commissioner's amendment adding the Checker entities to the ELIC conservation order.

---

[1] Although not relevant to the instant case, we note that on September 4, 1992, the Delaware Supreme Court filed its opinion on appeal of the chancery court decision. That opinion included an observation the trial court had no reason to decide whether petitioners were entitled to file an action in the ancillary state (Michigan) rather than the domiciliary state (California) since the issue was not properly before it. This, of course, has nothing to do with whether the California trial court sitting as an insolvency court has jurisdiction over petitioners in this proceeding, an issue which clearly was not before either Delaware court. We recount this venture into the Delaware courts merely as an interesting episode in the overall history of this litigation.

After a hearing on April 16, 1992, the trial court took the matter under submission. On June 10, 1992, the court denied the motion to quash. The court recited two grounds for this decision: (1) In an insurance insolvency action, a California court has personal jurisdiction over an out-of-state party even though that party had no "minimum contacts" with this state because a party choosing to engage in dealings with a California insurance company is deemed to consent to such jurisdiction. (2) Alternatively, California had jurisdiction over the Checker entities because the solicitation, negotiations, and other acts in which they engaged in California constituted sufficient "minimum contacts" to satisfy due process.

The trial court expressly extended the time in which petitioners could file a writ petition until July 15, 1992. On that date, petitioners filed this petition for writ of mandate and request for temporary stay of proceedings pursuant to California Code of Civil Procedure section 418.10, subdivision (c) which authorizes such writs when a trial court denies a motion challenging its jurisdiction. This court issued an order to show cause to be heard on November 5, 1992.

## Discussion

The trial court based its denial of petitioners' motion to quash on two independent and sufficient grounds.

(1) By soliciting and accepting investment funds from a California resident and regulated insurance company, petitioners impliedly consented to the jurisdiction of California courts in the event the insurance company later became subject to insolvency proceedings in California courts. This follows from the fact insurance company insolvencies are exempt from the federal bankruptcy laws and must be determined in state courts. These state insolvency proceedings are the substantial equivalent of federal bankruptcy proceedings. If they are to be effective, the relevant state court, in the domicile of the insolvent insurance company, must have control—i.e., jurisidiction—over all the assets as well as the liabilities of the insurance company just as a federal bankruptcy court would. Everyone who accepts investments of insurance company funds is or should be aware of these facts and this necessity. Consequently, they impliedly consent to this essential jurisdiction should the company which made the investment become insolvent.

(2) Irrespective of real party's status as conservator of a California insurance company, under more traditional due process analysis, petitioners had ample "minimum contacts" with California to confer personal jurisdiction on California courts.

Although we have serious reservations about the validity of the first rationale for the trial court's ruling, we uphold the court's decision on the basis of the second independent and sufficient grounds. Accordingly, we deny the petition for writ of mandate and vacate the stay of proceedings in the trial court.

I. *The Constitutional Requirements for Personal Jurisdiction.*

■ Before a state can claim constitutional jurisdiction over an out-of-state business, three questions must be answered. First, do that state's laws purport to confer jurisdiction over this class of out-of-state businesses? Second, if there is a statutory or other basis in state law, did the out-of-state business have "minimum contacts" with the state either in general or *with respect to the transaction out of which the dispute arises*? Third, does the state have sufficient interest in the resolution of the dispute—or is it otherwise reasonable—to justify a state's assertion of jurisdiction? (*International Shoe Co.* v. *Washington* (1945) 326 U.S. 310, 316-319 [90 L.Ed. 95, 101-104, 66 S.Ct. 154, 161 A.L.R. 1057].)

There is no dispute California law provides a basis for personal jurisdiction over petitioners. California's "long arm" statute expressly extends this state's reach to the outermost boundaries of what constitutional due process allows. (Code Civ. Proc., § 410.10 provides that California may exercise jurisdiction over a nonresident "on any basis not inconsistent with the Constitution of this state or of the United States.") Accordingly, if California's jurisdiction satisfies the two due process requirements, this state's courts have personal jurisdiction over petitioners in this case.

The level and character of "minimum contacts" due process requires will depend on whether the plaintiff's cause of action is based on the forum court's "general jurisdiction" over the foreign defendant or whether it is based on "specific jurisdiction."

■ To establish "general jurisdiction" the foreign defendant's contacts must be significant and continuous. If they are, the plaintiff's cause of action need not have anything to do with the defendant's contacts with the forum state. "If a party is subject to the general jurisdiction of a state, that party can be called to answer any claim against her, regardless of whether the subject matter of the cause of action has any connection to the forum." (*Mellon Bank (East) PSFS Nat. Ass'n.* v. *Farino* (3d Cir. 1992) 960 F.2d 1217, 1221.)

A lesser level of contacts will suffice, however, for "specific jurisdiction" in cases where there is a nexus between those contacts and the plaintiff's

cause of action. (*World-Wide Volkswagen* v. *Woodson* (1980) 444 U.S. 286 [62 L.Ed.2d 490, 100 S.Ct. 559].) ██ "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum [citation] and the litigation results from alleged injuries that 'arise out of or relate to' those activities [citation]. . . . [W]ith respect to interstate contractual obligations, we have emphasized that parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to regulation and sanctions in the other State for the consequences of their activities. (*Travelers Health Assn.* v. *Virginia* (1950) 339 U.S. 643, 647 [94 L.Ed. 1154, 1160-1161, 70 S.Ct. 927]." (*Burger King Corp.* v. *Rudzewicz* (1985) 471 U.S. 462, 472-473 [85 L.Ed.2d 528, 540-541, 105 S.Ct. 2174], fns. omitted.)

"Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there. [Citations.]" (471 U.S. at p. 476 [85 L.Ed.2d at p. 543], italics in original.)

██ The third and final inquiry is whether it is fair and reasonable to require the defendant to defend itself in that state. "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' [Citation.]" (471 U.S. at p. 476 [85 L.Ed.2d at p. 543].)

"Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute, [citation]; the plaintiff's interest in obtaining convenient and effective relief, [citation] . . . ; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in

furthering fundamental substantive social policies, [citation]." (*World-Wide Volkswagen Corp.* v. *Woodson, supra,* 444 U.S. 286, 292 [62 L.Ed.2d at p. 498].)

II.   *Petitioners Had Sufficient "Minimum Contacts" With California Related to the Dispute Over Which the California Court Seeks to Assert Personal Jurisdiction.*

█  Petitioners' contacts with California are not of a nature or quantity sufficient to confer "general jurisdiction" on California courts. For example, if this case involved a lawsuit for personal injuries caused by one of petitioners' taxicabs in Chicago the courts of this state would not have personal jurisdiction over petitioners based on the contacts reported in this record. But this is not a lawsuit based on a Chicago taxicab accident. It is a dispute over petitioners' attempt to terminate a partnership interest which petitioners solicited and negotiated with an insurance company in the State of California.

It is true petitioners did not have a significant physical presence within California during the solicitation and negotiation of this investment. But that is only because in this age of telecommunications, fax machines, and rapid mail services it is possible to perform these functions without face-to-face meetings in any jurisdiction. For that reason, due process does not require that petitioners have been physically present in California to be subject to the jurisdiction of the courts of this state. (*Burger King Corp.* v. *Rudzewicz, supra,* 471 U.S. 462, 476 [85 L.Ed.2d 528, 543], and cases cited therein.) (See discussion at pp. 1015-1016, *ante.*) What petitioners did do, or cause to be done, constituted the "minimum contacts" with California which due process requires.

The entity charged with the responsibility of assembling the financing for the leveraged buyout, CHC, sought out ELIC in California, knowing it was a California company. CHC needed ELIC to replace Empire, a New York insurance company, which had bowed out of the transaction. CHC wanted ELIC to become a major investor in the leveraged buyout and offered ELIC the *sole* limited partnership in the operating entity, Checker LP.

The offers, counteroffers, and terms of this arrangement were conveyed to and from California via correspondence, draft documents, telephone calls and the like. CHC, or its agents, initiated some of this correspondence and telephone calls addressed to California.

CHC likewise caused several of the critical legal documents—such as the note—to be sent to California for execution. The CEO of ELIC executed

some of these documents in California and agents of ELIC executed others, also in California, Those same documents were executed by CHC and the petitioner entities in other jurisdictions. It required the combination of document executions in California with the document executions in Michigan and New York to create the note which helped fund the leveraged buyout and the Checker LP entity which now operates the various Checker enterprises.

After ELIC's note and limited partnership interest were created, ELIC began receiving payments on both in California as provided in the agreements. There also was at least one meeting in California between representatives of petitioners and agents of ELIC about partnership affairs.

Finally, petitioners performed an act in Michigan which they knew would have a significant impact in California, especially among California policyholders of ELIC. That act was to declare ELIC's conservatorship was an "event of default" and then to terminate ELIC's partnership interest. Petitioners had every reason to know this act deprives the conservator—and thus the ELIC policyholders—of their share of the future profits of Checker LP. (This represents a substantial deprivation since Checker LP has been an unusually successful enterprise. ELIC's 10 percent share of those net profits has averaged nearly $2.5 million a year.)

While any single telephone call or piece of correspondence might not be enough to satisfy the "minimum contacts" requirement, there is much more in this case. Here there was a veritable "latticework" of contacts linking petitioners and the State of California: not one but many calls and other communications to California during the negotiations. The execution in California of the legal documents which formed the arrangement and created the partnership. The inclusion of a contract term which purported to dispossess California policyholders of their continuing interest in the partnership should the insurance company become insolvent. A continuing stream of payments from petitioners to California. A meeting in California discussing partnership matters. And, ultimately, an act outside California calculated to have detrimental impacts inside California adversely affecting policyholders whom California is committed to protecting.

This latticework of contacts is more than enough to satisfy due process. Through these actions petitioners "purposefully availed" themselves of benefits within California by seeking and obtaining millions of dollars in investments from a California insurance company. Many actions within California, including the execution of the documents implementing the investment and creating the partnership, "proximately result[ed] from actions by the defendant[s] . . . that create a 'substantial connection' with the

forum State." (*Burger King Corp.* v. *Rudzewicz, supra,* 471 U.S. at p. 475 [85 L.Ed.2d at pp. 542-543].) Moreover, since petitioners have "created 'continuing obligations' between [themselves] and residents of the forum, [citation], [they] manifestly [have] availed [themselves] of the privilege of conducting business there. . . ." (*Id.* at p. 476 [85 L.Ed.2d at p. 543].)

Petitioners virtually concede CHC's contacts with California are sufficient to confer jurisdiction on this state if those contacts indeed can be imputed to the other Checker entities. Petitioners rely primarily on an argument CHC and the petitioner entities are separate and independent of each other. Since CHC made all the contacts and entered into all the negotiations in California, their argument continues, the petitioner entities are completely insulated from those contacts and thus from the jurisdiction of the California courts.

An examination of the facts does not support petitioners' argument, however. The record clearly reflects CHC and the petitioner entities were inextricably intertwined in the transaction and contacts which confer jurisdiction on the California courts. CHC was and is an entity with only four principals. It was formed for the express purpose of soliciting and negotiating outside financing for the leveraged buyout of Checker. One of the principals was and is the chief executive officer and board chair of the corporation to be bought out—Checker. That corporation emerged from the leveraged buyout as a privately held corporation which is the sole surviving general partner of the new operating entity, Checker LP. Another of the four principals was and is a member of the board of Checker which was transformed from the publicly held operating entity to the privately owned general partner of the operating entity. A third of the four principals in CHC was a member of the board of ELNY, a wholly owned subsidiary of ELIC.

The avowed and actual purpose of the entire transaction was to "take Checker Motors Corporation private," that is, to convert it from a publicly traded corporation to one owned by a small group of private investors, principally the four individuals who were the sole owners of CHC. The plan as formulated and implemented called for the privately held Checker, largely owned and controlled by the CHC principals, to become general partner of the newly formed Checker LP which, in turn, would assume the assets and operating responsibilities the publically held corporation formerly held.

At the time the deal with ELIC was being negotiated, it would have been difficult to determine whether CHC was the "principal" or the "agent" in its relationship with the petitioner entities. Indeed, since all of the entities were largely controlled by the four individuals who were running CHC, it probably was a bit of both.

In any event, the transaction on its face was structured in such a way as to make the relationships between CHC and the petitioner entities completely transparent. For example, the document transmitting the $5 million note which CHC had negotiated through its several contacts with ELIC in California expressly stated the note while issued by CHC would immediately be assumed by Checker and shortly thereafter be assumed by Checker LP. It was those same California contacts and negotiations which produced the other essential element of the investment package, that is, ELIC's limited partnership interest in Checker LP which it was allowed to acquire for the token sum of $250,000.

This court would have to accept and indeed endorse a corporate shell game if it were to hold CHC contacts with California in approaching ELIC and negotiating this investment and partnership interest were not to be imputed to the petitioner entities. Under such a holding, any corporation interested in soliciting and negotiating major investments in other jurisdictions could avoid the jurisdiction of the courts in those states through the simple expedient of forming a "holding" corporation. The officers of that corporation, which might well be officers of the parent corporation, could personally go to other states. They could knock on the doors of potential investors. They could negotiate all the terms of the investment, execute all the necessary papers in that state in the name of the "holding" corporation. Then they could return with their bags of money to the home state and turn the funds over to the parent corporation.

Under the interpretation petitioners urge, the home states of the investors would not have jurisdiction over any disputes that might arise out of these investments because all the contacts in the investors' states would have been made in the name of the "holding" corporation rather than the operating entity which ultimately ended up with the investors' funds. This result is neither compelled by legal principle nor justified as good policy.

III. *It Is "Fair and Reasonable" for California Insolvency Courts to Assert Personal Jurisdiction Over Petitioners.*

The final constitutional hurdle which must be leapt before California courts can claim personal jurisdiction over a foreign business enterprise is that it be "fair and reasonable" to require the foreign business to appear in the California courts. The criteria to be applied in assessing this issue include the forum state's interest in adjudicating this particular dispute in its courts, the plaintiff's interest in resolution of its dispute in the forum state, the relative convenience or inconvenience to the out-of-state party of

defending itself in the forum state's courts, the "interstate judicial system's" interest in obtaining the most efficient resolution of this controversy, and the "shared interest of the several States in furthering fundamental substantive social policies." (*World-Wide Volkswagen Corp.* v. *Woodson, supra,* 444 U.S. 286, 292 [62 L.Ed.2d at p. 498].) (See discussion at pp. 1016-1017 *supra.*)

■ As to this constitutional issue, the burden shifts to the defendant who is seeking to avoid jurisdiction. "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional." (*Burger King Corp.* v. *Rudzewicz, supra,* 471 U.S. 462, 477 [85 L.Ed.2d 528, 543-544].)

■ It is in addressing this issue that California's strong interest in preserving the assets of its policyholders and the insolvency court's interest in maintaining control over all of the insolvent insurance company's assets and liabilities assume critical importance. We may question whether these interests, significant as they may be, are sufficient to confer personal jurisdiction over an out-of-state business which did *not* have "minimum contacts" with California; nonetheless these considerations become extraordinarily important when assessing the "fairness and reasonableness" of conferring jurisdiction over a defendant which *did* have "minimum contacts" with this state.

Moreover, assigning this dispute to the California insurance insolvency court also furthers "the interstate judicial system's interest in obtaining the most efficient resolution of controversies." (*World-Wide Volkswagen Corp.* v. *Woodson, supra,* 444 U.S. at p. 292 [62 L.Ed.2d at p. 498].) The entire "interstate judicial system" benefits when insurance company insolvencies and all the disputes they generate can be managed by a single court in a single jurisdiction, much as the federal bankruptcy courts handle insolvencies in other industries. This also tends to promote "the shared interest of the several States in furthering fundamental substantive social policies." (*Ibid.*) In this instance, that social policy is appropriate management of an insolvent insurance company's assets and debts to ensure maximum protection of the policyholders' interests.

Furthermore, we are not persuaded requiring this dispute to be adjudicated in California courts would impose an undue burden on petitioners. This is not a case which should require testimony from a large number of witnesses

located in a faraway state. Instead, it is largely a legal question revolving around the interpretation of the partnership agreement and the legality of certain terms of that agreement. But even if it did impose some inconvenience on petitioners, that would not be enough to outweigh California's interest in adjudicating this case as part of the overall ELIC insolvency proceeding nor the other interests favoring resolution in California courts.

## DISPOSITION

The petition for writ of mandate is denied.

Lillie, P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied March 25, 1993, and the opinion was modified to read as printed above. Petitioners' application for review by the Supreme Court was denied June 3, 1993.