Filed 6/28/22  Birenbaum v. Burrell CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| EVAN BIRENBAUM, | B309894 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. |
| v. | No. 19STCV39029) |
| DANIEL BURRELL et al., |  |
| Defendants and Respondents. |  |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven J. Kleifield, Judge.  Affirmed.

Nelson & Fraenkel, Gretchen M. Nelson, Gabriel S. Barenfeld, Gabriel Beugelmans; Radcliff Mayes and Jules G. Radcliff, Jr., for Plaintiff and Appellant.

Keller/Anderle, Jennifer Keller and Anand Sambhwani for Defendants and Respondents.

_____

Plaintiff and appellant Evan Birenbaum (Birenbaum) appeals from a judgment entered after the trial court granted the motion of defendants and respondents Daniel Burrell (Burrell) and Burrell Diversified Investments, LLC (BDI) to quash service of summons for lack of personal jurisdiction. Because there is insufficient evidence that Burrell and BDI purposefully availed themselves of the privileges of conducting activities in California, we affirm.

## BACKGROUND

I. *Facts*[1]

A. <u>The parties</u>

Birenbaum is a California resident, who has lived in Los Angeles continuously since 2006. He has "expertise in developing cross-infrastructure analytics and technology for big data application; . . . an understanding of blockchain technology; and . . . extensive experience working with power utilities and energy suppliers."

At all relevant times, Burrell has been a resident of either Colorado or New Mexico. Burrell is the sole member and manager of BDI, a Delaware limited liability company with its principal place of business in Aspen, Colorado, and, previously, in Santa Fe, New Mexico. Neither Burrell nor BDI regularly conducts business in California.

---

[1] The facts summarized in this section are taken from allegations in the first amended complaint and the evidence, including declarations of Birenbaum and Burrell, submitted in support of and in opposition to Burrell and BDI's motion to quash service of summons.

B.  Burrell meets Birenbaum in New Mexico

In 2017, Burrell and Kevin Washington (Washington) began exploring plans to build and operate a bitcoin mining facility (the project).  They began buying bitcoin mining equipment from Joby Weeks (Weeks).  In late October 2017, Weeks flew Birenbaum to New Mexico for a meeting with Burrell to discuss the project.  At that meeting, Birenbaum "provided critical input and information" from which "the specifics of a plan were formed to build a data center."

C.  Birenbaum starts working on the project

By early November 2017, Birenbaum had started working on the project, with the promise of a written contract to come affording him a base salary, shares in the operating entity, and a percentage of the revenue from the mining equipment.

The location for the bitcoin mining facility was initially undetermined.  With Birenbaum's guidance, the decision was made to locate it in Montana.  Negotiations ensued to purchase an abandoned electrical substation in Butte, Montana, which was eventually acquired in early January 2018.

During November and December 2017, Birenbaum "spent countless hours . . . to engineer the bitcoin plant."  This included "the negotiation of power contracts to run the plant, the complete design and buildout of the physical infrastructure for the servers, [and] the design and development of the internal portion of the plant so as to allow the operation to run efficiently."  During this period, Birenbaum "worked primarily in Los Angeles with occasional trips to Burrell's private residence in Colorado for meetings and trips to Montana to examine the plant facility."  Birenbaum also travelled to countries including Malaysia, Australia, and the Republic of Georgia to conduct research.

D.  The employment agreement

On December 5, 2017, Birenbaum and Washington met in Los Angeles to discuss the project.  During another meeting in Los Angeles on December 10, 2017, Burrell, Washington, and Birenbaum "negotiated the specific terms of [Birenbaum's] employment and compensation . . . ."  Birenbaum "was offered a base salary, option shares in the data center's operating entity, and a portion of the revenues generated from, and investment in, Burrell's and Washington's mining equipment."  Birenbaum was also "to receive a 'signing bonus' as compensation for the extensive work [he] had already rendered in service of the project."

Following the December 10, 2017, meeting, Birenbaum exchanged e-mails with Burrell and Scott Mosebach regarding drafts of an employment agreement.  These negotiations culminated on December 31, 2017, when Burrell presented Birenbaum with a written employment agreement signed by Burrell as the chief executive officer of BitPower LLC (BitPower).[2]

The December 31, 2017, employment agreement offered Birenbaum the position of chief operating officer, a base annual salary, "Membership Units[,]" a signing bonus "paid upon the successful installation of the first order[,]"and paid time off "[i]n addition to federal and Montana state holidays[.]"  It specified the "[l]ocation" (bolding and underling omitted) as "Butte, Montana"

---

[2]    BitPower was a Delaware limited liability company formed by Burrell and Washington to own and operate the project.  BitPower was later renamed CryptoWatt Mining, LLC (CryptoWatt).

and "Aspen, Colorado." As for governing law, it stated: "The terms of this offer letter and the resolution of any disputes will be governed by the laws of the State of Montana, without giving effect to conflict of laws principles. Any action relating to this offer letter must be brought in the federal or state courts having jurisdiction and venue in or for the courts located in Missoula County, State of Montana, and the parties irrevocably consent to the jurisdiction of such courts." It also contained an arbitration clause providing that Birenbaum and BitPower "shall submit to mandatory and exclusive binding arbitration of any controversy or claim arising out of, or relating to, this agreement or any breach of this letter" to be "held in the State of Montana, Missoula County[.]"[3]

Because "Burrell made clear that the [December 31, 2017, employment agreement] was a 'take it or leave it[,]'" and Birenbaum had already spent hundreds of hours working on the project without payment, Birenbaum "was left with no alternative but to sign" the employment agreement even though it contained less lucrative terms than had been previously promised.

E. Birenbaum is terminated from the project

By February 2018, Birenbaum had succeeded in getting the bitcoin mining facility on the cusp of being operational. Nevertheless, on February 23, 2018, Burrell suddenly removed Birenbaum from the facility. Birenbaum continued to work on the project's Web site, branding, and business development from Los Angeles.

---

[3] Earlier drafts stated that the location was "Los Angeles, California" and included a Los Angeles, California, forum selection clause.

5

On April 3, 2018, Birenbaum received a proposed rescission and mutual release. Upon receiving the proposed rescission, Birenbaum ceased all work on the project. He did not sign the proposed rescission. The unsigned proposed rescission stated that it was made between CryptoWatt and Birenbaum and had a line for Burrell to sign as CryptoWatt's manager. The unsigned proposed rescission included a waiver of Civil Code section 1542.

II. *The Lawsuit*

In October 2019, Birenbaum brought this action against various defendants, including Burrell and BDI.[4] As to Burrell and BDI, the first amended complaint asserted causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, and recovery of unpaid wages (Lab. Code, § 201). Burrell was served with process in Aspen, Colorado. BDI was served with process in Dover, Delaware.

III. *Burrell and BDI's Motion to Quash Service of Summons*

On March 2, 2020, Burrell and BDI filed a motion to quash service of summons for lack of personal jurisdiction.[5] Burrell and BDI argued that the project was located in Montana; Burrell and BDI's project-related activities were conducted in New Mexico, Colorado, and Montana; and the employment agreement required disputes related to Birenbaum's work on the project to be brought in Montana and be governed by Montana law.

---

[4]     The other defendants are not parties to this appeal.

[5]     The first amended complaint was filed while the motion to quash was pending on August 3, 2020. The parties stipulated that Burrell and BDI's motion to quash would be directed at the first amended complaint.

6

In support, Burrell submitted a declaration in which he averred that he oversaw activities related to the project from Aspen, Colorado, and during site visits to Butte, Montana. Based on the employment agreement and because the bitcoin mining facility was located in Montana, he "anticipated that any legal proceedings initiated by Birenbaum related to the [p]roject or the [December 31, 2017, employment a]greement would occur in Montana" and not in California.

IV. *Birenbaum's Opposition*

In his opposition to the motion to quash, Birenbaum argued that the fraudulent conduct that he alleged against Burrell and BDI "stem[med] from an in-person meeting at Washington's house in Los Angeles, where Burrell and Washington induced [Birenbaum] to accept and continue employment on the project, by promising a bonus, equity and revenue sharing, which they never intended to pay." (Italics omitted.)

In his declaration submitted in support of his opposition, Birenbaum testified that he worked more than half of his total working days on the project from Los Angeles and resided there throughout the duration of his employment. He paid income tax in California and deposited his paychecks into his California checking account.

V. *The Trial Court's Ruling*

Following hearings in August and September 2020, the trial court granted Burrell and BDI's motion to quash on the ground that there was no constitutionally sufficient basis for California to exercise personal jurisdiction over those defendants.

The trial court noted that, in the December 31, 2017, employment agreement, the location of the project was stated to be Butte, Montana, and Aspen, Colorado, which "was consistent

7

with the undisputed fact that Montana was selected as the site . . . ." The court found that the employment agreement's terms—that the contract and the resolution of any disputes would be governed by Montana law, that actions would need to be brought in any court having jurisdiction and venue in Missoula County, Montana, that the parties irrevocably consented to the jurisdiction of such courts, and that any such case would be submitted to arbitration in Missoula County, Montana—were "strong evidence that [Burrell and BDI] had no reasonable expectation that any action arising out of the parties' relationship would be pursued in California" and "[i]n fact, their expectations were totally to the contrary." The court observed that "[w]hile [Birenbaum] may have been reluctant to sign the [December 31, 2017, employment agreement], he did so nevertheless" and "ma[de] no argument that the contract should be rescinded or modified."

The trial court found that "[w]hile [Birenbaum] had strong connections to California, [Burrell and BDI] in their business activities as they relate to this case did not." The court explained: "The most that can be said in favor of personal jurisdiction in California is that some negotiations occurred here, and that [Birenbaum] could work remotely in California. If corporations could be subject to the jurisdiction of courts in states where employees are allowed to work remotely, some could be subject to personal jurisdiction in all fifty states. Local negotiations and remote work on [Birenbaum's] part would not reasonably cause [Burrell and BDI] to believe that they were subjecting themselves to the jurisdiction of California courts. [¶] While the local negotiations contributed to the formation of the contract that gave rise to the employment relationship, the actual

8

contract called for business to be conducted in Montana. That is, in fact, where the company's business was done. Thus, the 'activity' or 'occurrence' took place outside of California."

VI. *Appeal*

Following the notice of entry of judgment quashing service of summons, Birenbaum filed a timely notice of appeal.

## DISCUSSION

I. *Relevant Law*

California courts "may exercise jurisdiction on any basis not inconsistent with the" federal or state Constitution. (Code Civ. Proc., § 410.10.) The federal Constitution permits a state to exercise personal jurisdiction over an out-of-state defendant "if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate "'traditional notions of fair play and substantial justice.'" [Citations.]" (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444–445.) "'Minimum contacts exist where the defendant's conduct in, or in connection with, the forum state is such that the defendant should reasonably anticipate being subject to suit in that state.' [Citation.]" (*Jacqueline B. v. Rawls Law Group, P.C.* (2021) 68 Cal.App.5th 243, 252 (*Jacqueline B.*).)

Personal jurisdiction may be either general (also known as all-purpose)[6] or specific (also known as case-linked). (*Ford Motor*

---

[6] "General jurisdiction subjects an out-of-state defendant to suit in a forum state by anyone irrespective of the subject matter of the lawsuit. [Citation.]" (*Jacqueline B.*, *supra*, 68 Cal.App.5th at p. 252.) Because Birenbaum only argues that Burrell and BDI are subject to specific jurisdiction, we do not address general jurisdiction further.

*Company v. Montana Eighth Judicial District Court* (2021) 141 S.Ct. 1017, 1024.)

Specific jurisdiction "hinges on the "'relationship among the defendant, the forum, and the litigation.'" [Citations.] It requires "'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" [Citation.] Consistent with the constraints of due process, 'the defendant's suit-related conduct must create a substantial connection with the forum State.' [Citation.]" (*Rivelli v. Hemm* (2021) 67 Cal.App.5th 380, 392 (*Rivelli*).)

Three requirements must be met for a California court to exercise specific jurisdiction over an out-of-state defendant. (*Rivelli*, *supra*, 67 Cal.App.5th at p. 392.) "First, the defendant must have purposefully availed himself of the privilege of conducting activities in this state, thereby invoking the benefits and protections of California's laws. Second, the claim or controversy must relate to or arise out of the defendant's forum-related contacts. Third, the exercise of jurisdiction must be fair and reasonable and should not offend notions of fair play and substantial justice. [Citations.]" (*Ibid.*) The plaintiff "bears the initial burden of establishing the first two elements by a preponderance of the evidence, and if the plaintiff does so, the out-of-state defendant then bears the burden of convincing the court why the exertion of personal jurisdiction would not comport with fair play and substantial justice. [Citations.]" (*Jacqueline B.*, *supra*, 68 Cal.App.5th at p. 253.)

As relevant to our analysis here, "[a]n out-of-state defendant purposefully avails itself of a forum state's benefits if the defendant (1) purposefully directs its activities at the forum

10

state's residents, (2) purposefully derives a benefit from its activities in the forum state, or (3) purposefully invokes the privileges and protections of the forum state's laws by (a) purposefully engaging in 'significant activities' within the forum state or (b) purposefully creating 'continuing [contractual] obligations' between itself and the residents of the forum state. [Citations.]" (*Jacqueline B.*, *supra*, 68 Cal.App.5th at p. 253.)

"[A]n out-of-state defendant's conduct toward the forum State or its residents is relevant to the jurisdictional analysis only if that conduct is purposeful, deliberate, and intentional. [Citations.] An out-of-state defendant's contact with a forum state that is 'random[,]' 'fortuitous[,]' or 'attenuated' is not enough. [Citations.]" (*Jacqueline B.*, *supra*, 68 Cal.App.5th at p. 254.)

II. *Standards of Review*

On appeal, we independently review the trial court's legal conclusions bearing on personal jurisdiction. (*Rivelli*, *supra*, 67 Cal.App.5th at p. 393.) "If the facts giving rise to jurisdiction are conflicting, we will not disturb the trial court's express or implied factual determinations where supported by substantial evidence. [Citation.] 'When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record.' [Citation.]" (*Ibid.*)

III. *Analysis*

Having independently reviewed the record,[7] we conclude that Birenbaum failed to meet his burden of establishing, by a

---

[7] The evidence relevant to our analysis below is largely undisputed and, at most, presents mixed issues of law and fact. Therefore, our independent review is warranted. (See *Rivelli*,

preponderance of the evidence, that Burrell and BDI purposely availed themselves of the privileges of conducting activities in California. Because specific jurisdiction is defeated on this basis alone, we need not address whether Birenbaum's claims relate to or arise out of Burrell and BDI's forum-related contacts or whether the exercise of jurisdiction would be fair. (See *Pebble Beach Co. v. Caddy* (9th Cir. 2006) 453 F.3d 1151, 1155 ["'If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law.' [Citation.]"].)

The weight of the evidence indicates that Burrell and BDI did not purposefully direct their activities at California residents, purposefully derive a benefit from their activities in California, or purposefully invoke the privileges and protections of California's laws. (See *Jacqueline B.*, *supra*, 68 Cal.App.5th at p. 253.) We come to this conclusion for two primary reasons.

First, the project was not located in California. The physical location of the bitcoin mining facility may have been undetermined when Burrell first met Birenbaum, but there is nothing in the record to suggest that California was ever considered as a possibility, and, by November 2017, it was settled that it would be built in Montana. The December 31, 2017, employment agreement identifies the location of the employment as Butte, Montana (where the facility was physically located) and Aspen, Colorado (from where Burrell oversaw activities related to the project and BDI's principal place of business). This strongly suggests that Burrell sought to derive a benefit from his activities in Montana and, to a lesser extent, Colorado—not California.

---

*supra*, 67 Cal.App.5th at p. 394; *Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 585.)

Second, rather than purposefully invoking the privileges and protections of California's laws, Burrell explicitly sought to invoke those of Montana through the December 31, 2017, employment agreement's choice-of-law and forum selection clauses.

"Choice-of-law and forum selection clauses, 'standing alone', are not dispositive" to the issue of purposeful availment. (*T.A.W. Performance, LLC v. Brembo, S.p.A.* (2020) 53 Cal.App.5th 632, 646 (*T.A.W. Performance*); cf. *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 482 (*Burger King*) [a choice-of-law provision "standing alone would be insufficient to confer jurisdiction"].) Nor do these clauses in private agreements deprive a California court of jurisdiction if other bases for jurisdiction are present. (*Smith, Valentino & Smith, Inc. v. Superior Court* (1976) 17 Cal.3d 491, 495 (*Smith*).) But such clauses "may 'reinforce' whether or not a foreign corporation has made such 'a deliberate affiliation with the forum state' as to support a conclusion that it should have reasonably foreseen 'possible litigation there.' [Citations.]" (*T.A.W. Performance*, *supra*, at p. 646; see also *Burger King*, *supra*, at p. 482 ["Nothing in our cases . . . suggests that a choice-of-law provision should be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws' for jurisdictional purposes" (italics omitted)].)

Birenbaum contends that "[t]he main question on this appeal . . . is whether a private agreement between two parties can oust a court of its jurisdiction when other minimum contacts exist." We agree with Birenbaum that it cannot (*Smith*, *supra*, 17 Cal.3d at p. 495), but we disagree with him that this is a question—let alone the *main* question—before us. Rather, we

conclude that given the Montana choice-of-law and forum selection clauses in the December 31, 2017, employment agreement *and* the lack of minimum contacts with California, the weight of the evidence points away from Burrell and BDI's purposeful availment of California as a forum such that they would not reasonably expect to be sued here.

We acknowledge that some evidence exists indicating a connection between Burrell and BDI and California but find that it is outweighed by the evidence against purposeful availment. (See *Jacqueline B.*, *supra*, 68 Cal.App.5th at p. 257 [weighing "factors tend[ing] to point toward purposeful availment" with those "point[ing] away from purposeful availment"].)

It is undisputed that Burrell and Birenbaum met on December 10, 2017, in Los Angeles to negotiate details of Birenbaum's employment and compensation. But this meeting was just one event during protracted negotiations that had commenced by early November 2017 and concluded when the December 31, 2017, employment agreement was signed. Birenbaum attempts to characterize the Los Angeles meeting as a critical moment in these negotiations, arguing in his reply brief that "[i]t was not until the Los Angeles meeting, that the parties negotiated and agreed on the terms of Birenbaum's employment[.]" This characterization is severely undermined by Birenbaum's own allegations in the first amended complaint that parties, including Burrell and BDI, convinced him to start work on the project in early November 2017 with the promise of a forthcoming written contract affording him a base salary, shares in the operating entity, and a percentage of revenue to be earned

14

from the mining equipment.[8]  Viewed in its proper context, we do not find that the December 10, 2017, meeting in California is sufficient to demonstrate Burrell and BDI's purposeful availment of the state.

It is also undisputed that Birenbaum worked remotely at times from Los Angeles.  But this fact points primarily to Birenbaum's own contacts with California—not that of Burrell or BDI.  (See *Floyd J. Harkness Co. v. Amezcua* (1976) 60 Cal.App.3d 687, 691 ["In examining the quality and nature of the activities in this state, . . . we are not concerned with the performance of the plaintiff in California but exclusively with the nonresident defendant's activities in this state"].)  We have found nothing in the record suggesting that Burrell required or

---

[8]  Specifically, the first amended complaint alleges:  "In or around early November 2017, the [defendants including Burrell and BDI] convinced [Birenbaum] to commence work on the project with the promise of a contract that would afford [him] a base salary and shares in the operating entity as well as a percentage of the revenue to be earned from the mining equipment.  Based on verbal and written representations made to him by the [defendants including Burrell and BDI] that [Birenbaum] would have a written contract containing the foregoing terms, [Birenbaum] commenced work on the project in or around November 2017.  Ultimately, the [defendants including Burrell and BDI] presented [Birenbaum] with a contract nearly two months later, which modified the original agreement to incorporate provisions that were less lucrative but provided for a base salary, a signing bonus (but defendants modified the terms of the bonus to alter the condition of payment) and 'Membership Unit Awards' comprised of options and a percentage of the investments and distributions of revenue paid to the [defendants including Burrell and BDI]."

encouraged Birenbaum to work remotely from California.[9] Rather, the employment agreement specifies the location of the employment as Butte, Montana, and Aspen, Colorado; affords Birenbaum paid time off for Montana state holidays; and is silent regarding remote work.

Birenbaum points to the provision in the proposed rescission that he was given on April 3, 2018, waiving any rights under Civil Code section 1542,[10] as evidence "firmly demonstrat[ing]" that Burrell and BDI "anticipated being haled into a California court for the very claims brought in this lawsuit, and they sought Birenbaum's agreement to the [p]roposed [r]escission to shore up their defenses under California law." (Bolding omitted.) We cannot agree. The inclusion of a boilerplate waiver of Civil Code section 1542 in a proposed rescission that was never signed provides minimal, if any, evidentiary support for Burrell and BDI's purposeful availment of the privileges of conducting activities in California. It may

---

[9]     In his opening brief, Birenbaum contends that after his removal from the Butte bitcoin mining facility, "he was told to work from California" and that Burrell and BDI "required him to work from California[.]" Birenbaum does not cite to, nor have we independently located, evidence in the record indicating such an affirmative requirement that Birenbaum work in California. Arguments in briefs are not evidence. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414, fn. 11 ["It is axiomatic that the unsworn statements of counsel are not evidence. [Citations.]"].)

[10]     At the time, that section provided: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." (Former Civ. Code, § 1542.)

suggest that they were concerned that Birenbaum would seek California as a forum for *his* claims, but that is not relevant to our analysis.  (See *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269 [explaining that it is the defendant's intentionality that is the focus of the purposeful availment inquiry].)

We also find the two cases upon which Birenbaum relies for the proposition that "California courts routinely find sufficient minimum contacts when, like here, a foreign person or entity reaches out to negotiate a contract with California residents"— *Checker Motors Corp. v. Superior Court* (1993) 13 Cal.App.4th 1007 (*Checker*) and *Epic Communications, Inc. v. Richwave Technology, Inc.* (2009) 179 Cal.App.4th 314 (*Epic*)—to be easily distinguishable.

In *Checker*, the Court of Appeal found that out-of-state entities that sought and obtained millions of dollars in investments from a California insurance company had sufficient minimum contacts with California to confer personal jurisdiction on the state court.  (*Checker, supra*, 13 Cal.App.4th at pp. 1010–1011, 1017–1019.)  Although the out-of-state entities lacked "a significant physical presence within California" (*id.* at p. 1017), "there was a veritable 'latticework' of contacts linking [the entities] and the State of California: not one but many calls and other communications to California during the negotiations.  The execution in California of the legal documents which formed the arrangement and created the partnership.  The inclusion of a contract term which purported to dispossess California policyholders of their continuing interest in the partnership should the insurance company become insolvent.  A continuing stream of payments from petitioners to California.  A meeting in California discussing partnership matters.  And, ultimately, an

17

act outside California calculated to have detrimental impacts inside California adversely affecting policyholders whom California is committed to protecting." (*Id.* at p. 1018.) No such "'latticework' of contacts" (*ibid.*) found in *Checker* exists here linking Burrell and BDI with California.

In *Epic*, a resident of Taiwan entered into a nondisclosure agreement with a California business on behalf of her employer and then travelled to California to negotiate an agreement that contemplated the ongoing performance of services *in* California by the California business. (*Epic*, *supra*, 179 Cal.App.4th at pp. 319–320, 329.) The Court of Appeal found that the employee and an entity she later formed had sufficient contacts with California and could reasonably anticipate being sued there. (*Id.* at pp. 329–331.) Here, in contrast, Burrell and BDI did not seek out a California resident with whom to conduct business. Rather, it was Weeks, a third party, who flew Birenbaum out to New Mexico in order to introduce him to Burrell in regards to the project. Nor did Burrell or BDI enter into an agreement regarding the ongoing performance of services in California.

Finally, we have considered *Casey v. Hill* (2022) 78 Cal.App.5th 1143 (*Casey*) and conclude that it, too, is distinguishable and does not sway us to find purposeful availment.[11] In *Casey*, a Missouri couple sued a California corporation and its owner, a California resident, in Missouri state court "for making deceptive and fraudulent representations to the couple in the course of providing them with adoption facilitation

---

[11]    Birenbaum filed a letter informing us of *Casey* under California Rules of Court, rule 8.254(a), which permits a party to inform the court of "significant new authority" not available in time to be included in the party's last brief.

18

services." (*Casey, supra,* at p. 1153.) After a default judgment was entered against the defendants in the Missouri case, the couple applied to a California superior court for entry of judgment on the Missouri judgment. (*Id.* at pp. 1153, 1156–1158.) The application was granted, but the California superior court later vacated the entry of the Missouri judgment, ruling that the Missouri court's exercise of jurisdiction over the California defendants violated due process. (*Id.* at pp. 1158, 1161–1163.)

The Court of Appeal reversed the superior court's order vacating the Missouri judgment. (*Casey*, *supra*, 78 Cal.App.5th at p. 1154.) It concluded that the superior court had ignored undisputed jurisdictional facts sufficient to establish purposeful availment of the Missouri forum by the California defendants. (*Casey, supra,* at p. 1171.) That evidence showed that the California defendants presented the Missouri couple with an agreement to provide adoption facilitation services and, to provide those services, the corporation sent numerous allegedly fraudulent communications into Missouri, causing injury in Missouri. (*Id.* at pp. 1171, 1173–1174.)

In *Casey*, sending communications into the forum state to residents of that state was a material part of the defendants' performance of the business agreement. For the reasons we have discussed above, the same cannot be said for Burrell and BDI's California-related contacts.

19

**DISPOSITION**

The judgment is affirmed.  Burrell and BDI are entitled to costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST

We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT