Filed 6/24/26

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| WILLIAM B. PITT et al., Plaintiffs and Appellants, v. YURI SHEFLER, Defendant and Respondent. | B338608 (Los Angeles County Super. Ct. No. 22STCV06081) |

APPEAL from an order of the Superior Court of Los Angeles County, Lia Martin, Judge.  Reversed.

Bird, Marella, Rhow, Lincenberg, Drooks & Nessim, Thomas R. Freeman, John V. Berlinski, Julia B. Cherlow, Brandon R. Teachout; Wachtell, Lipton, Rosen & Katz, Jonathan M. Moses, Adam L. Goodman, Jessica L. Layden and Ioannis D. Drivas, for Plaintiffs and Appellants.

Lesnick Prince Pappas & Alverson and Matthew A. Lesnick; Brito and Alejandro Brito, for Defendant and Respondent.

———————————————

In 2008 William B. Pitt and Angelina Jolie, through their respective California investment companies, acquired Chateau Miraval, S.A., a French company that owns a vineyard. In 2021, five years after Jolie filed for divorce from Pitt, Jolie sold her California company that owned 50 percent of Miravel to Tenute del Mondo B.V., a Dutch company, which was a subsidiary of a Cyprian company, SPI Group Holding Limited (SPI Group). As a result of the sale, Pitt became an unwilling partner of Tenute and Tenute's beneficial owner, Yuri Shefler.

Pitt and his California investment company Mondo Bongo, LLC sued Jolie, SPI Group, Tenute, Shefler, and others for breach of contract, tortious interference with contractual relations, and related claims. Shefler moved to quash service of summons for lack of personal jurisdiction, asserting he was a Swiss resident with minimal involvement in the negotiations for Tenute to purchase Miraval; rather, Jolie's Luxembourg-based lawyer negotiated with Tenute and SPI Group's European representatives in Europe. The trial court granted the motion, finding Pitt and Mondo Bongo failed to present evidence that Shefler purposefully availed himself of the benefits of doing business in California.

We might agree there is no personal jurisdiction over Shefler if, as he claims, he had a minimal role in the negotiations by European companies in Europe to buy a French vineyard, with jurisdiction based simply on the effect of those negotiations on a California resident and company (Pitt and Mondo Bongo). But Shefler directed the European representatives for Tenute and SPI Group in the negotiations; played a significant role in structuring and finalizing the deal to purchase Nouvel, Jolie's California company that owned Miraval; guaranteed $39 million

2

of the purchase price paid to Jolie, a California resident; and communicated with Jolie and her California business manager regarding his company's purchase of Nouvel.  Further, the agreement to purchase Nouvel was governed by California law with a California forum-selection clause.  It was these contacts by Shefler with California in purchasing a California company from a California resident that caused the injury to another California resident and California company that is the subject of the lawsuit.  On these facts, Shefler purposefully availed himself of the benefits of a California forum, and the controversy arose out of his contacts with the forum.  We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Jolie and Pitt Acquire Chateau Miraval S.A.*

Miraval is a French company that owns a vineyard and residential property in France.  Miraval is owned by Quimicum S.a r.l., a Luxembourg limited liability company.

In 2008 California residents Jolie and Pitt, through their respective investment companies, purchased Quimicum for the purpose of acquiring Miraval.  Jolie established Nouvel, a California limited liability company, with Jolie as the sole member.  Pitt established Mondo Bongo, also a California limited liability company, with Pitt as the sole member.  Nouvel purchased a 40 percent ownership interest in Quimicum, and Mondo Bongo purchased a 60 percent ownership interest.  Shortly before Pitt and Jolie were married in 2014, Mondo Bongo transferred additional shares of Quimicum to Nouvel such that Nouvel and Mondo Bongo each owned 50 percent of Quimicum.

3

The Quimicum articles of association, as amended in 2013, provided that shares of the company could not be transferred to non-shareholders unless three-quarters of the shareholders consented to the transaction.

Jolie filed for divorce from Pitt in 2016, and the former couple began negotiating the distribution of their assets, including Miraval. Negotiations continued over the next few years, and the parties were close to reaching a deal regarding Miraval when Jolie terminated negotiations in mid-2021.

B.    *Tenute Acquires Miraval*

Tenute is a Dutch company that owns several wine businesses in Europe and Argentina. Tenute is the wholly owned subsidiary of SPI Group, a private company incorporated in Cyprus. Shefler is the beneficial owner of SPI Group.[1] Shefler is also the beneficial owner of a majority stake in Luxembourg company Stoli Group S.a. r.l.,[2] which produces and distributes several spirits, including Stolichnaya Vodka.

In March 2021 outside counsel for SPI Group emailed counsel for Jolie stating that he "represent[ed] a company that is interested in acquiring an asset from one of your clients." A few days later, Todd Culyba, general counsel of Stoli Group, emailed Laurent Schummer, Jolie's Luxembourg-based counsel. The

---

[1]    Shefler is the beneficiary of the YVS Trust, which wholly owns SPI Group.

[2]    Stoli Group is a subsidiary of Luxembourg company SPI Group S.a r.l, not to be confused with Cyprian entity SPI Group. Shefler is the majority owner of SPI Group S.a r.l. For clarity, we refer to Stoli Group and its parent company collectively as "Stoli Group."

4

email copied Alexey Oliynik, who at the time was employed by Stoli Group.[3] Oliynik is a resident of Switzerland, and Culyba appears to be a resident of Luxembourg. In his March 2021 email, Culyba informed Schummer that he had been given Schummer's contact information by Jolie's counsel in the United States. Culyba requested a meeting with Schummer in Luxembourg to discuss Miraval. Schummer and Culyba met in Luxembourg on April 8, 2021. After the meeting, Culyba informed Schummer that the "relevant entity from our end" for purposes of drafting a non-disclosure agreement would be Tenute.

Over the next six months the parties negotiated for the purchase by Tenute of all shares of Nouvel from Jolie. The principal negotiators were Schummer on behalf of Jolie and Culyba and Oliynik on behalf of Tenute. In May 2021 Tenute and Nouvel entered into a Confidentiality Agreement, signed by Jolie's Los Angeles-based business manager Terry Bird on behalf of Nouvel, pursuant to which Tenute agreed it would not disclose confidential information provided by Nouvel other than disclosures to representatives of Tenute that were necessary to enable Tenute to evaluate or negotiate the potential purchase of Nouvel. In defining the representatives of Tenute to whom confidential information could be disclosed, the agreement specifically allowed disclosure to "the ultimate beneficial owner" of Tenute.

---

[3] By the time he submitted a declaration in this matter in March 2024, Oliynik was a director of SPI Group. Oliynik explained that "[w]ithin the Stoli spirits conglomerate, individuals colloquially refer to the entire group of companies as 'Stoli', 'SPI', or 'SPI Group'."

There is evidence that, at least as of May 2021, Culyba and Oliynik consulted with Shefler during the course of negotiations. In May 2021 Oliynik sent an email to Culyba and the chief financial officer of Stoli Group with three proposals for how to structure the purchase of Nouvel, two of which were identified as "YS's approach." In May or June, representatives for Tenute and Jolie negotiated an Exclusivity Agreement that prohibited Jolie from pursuing the sale of Nouvel to any third party so long as the negotiations with Tenute were ongoing. Tenute signed the agreement in June, then Oliynik sent an email to Schummer inquiring as to why Jolie had not yet signed. Oliynik wrote that Tenute's attorneys had suggested it revoke its signature and "Mr. Shefler is considering that advice." Oliynik continued, "In the meantime, I was instructed by Mr. Schefler [sic] to reach out to you and ask a question when we should expect to receive the countersigned document." Jolie subsequently signed the Exclusivity Agreement in early July. The agreement was governed by California law and included a California forum-selection clause.

By mid-July 2021 the parties had reached at least a preliminary deal as evidenced by a letter Shefler wrote to Jolie. The letter was emailed by Sabina Fatkullina, a chief of staff at Stoli Group, to Oliynik, to send on Shefler's behalf to Jolie. Fatkullina stated in her email: "Here we are—the letter to be sent to AJ . . . approved by YV."[4] In the letter, Shefler wrote, "I would like to thank you for your trust in me & my company, and accepting my offer made in regards to sale of Miraval. [¶] . . . [W]e are advancing in a confident manner towards

---

[4] "YV" refers to Yuri Viktorovich Shefler.

6

signing a binding agreement, aiming to do so within the next couple of weeks. [¶] I am aware of the potential complications of the deal as it is not that straight forward as we all would like it to be, however, I am confident that if there is a wish—the way will always be found and the will is here."

The parties appeared even closer to a final agreement by mid-August 2021, when Oliynik emailed other employees of Stoli Group and SPI Group, stating he expected Jolie to have additional comments regarding the current draft agreement, but Tenute had signed it because "Mr. S asked us to send a signed version in order to stimulate a sense of urgency on their end."

Two weeks later, Oliynik drafted a letter to be sent from Shefler to Jolie following the acquisition of Nouvel. Oliynik emailed the draft to another SPI Group employee, asking her to forward it to Shefler "for his review." The employee forwarded the email (with the draft letter) to Shefler the same day. The draft (unsigned) letter explained to Jolie that, upon acquiring Nouvel, representatives of SPI Group "plan[ned] to contact the other shareholders [i.e., Mondo Bongo] in order to introduce ourselves as their future partners." The draft explained SPI Group intended to inform Mondo Bongo of SPI Group's accomplishments and holdings in the wine and spirits market, recognize the success of the Miraval brand, and underscore its desire to work collaboratively toward the further success of Miraval.

Tenute and Jolie executed the final agreement on September 24, 2021. The agreement contained a choice of law provision specifying the agreement would be governed by California law, and the parties agreed to submit to the jurisdiction of state and federal courts in California. The

7

agreement provided that Jolie would transfer her interest in Nouvel to Tenute in exchange for $64 million, payable in four installments. An initial payment of $25 million (less a deposit amount) would be paid upon closing, and the remaining $39 million would be paid in three installments between the closing date and December 31, 2021. The agreement further provided that the three post-closing payments would be subject to a "first demand bank guarantee" to be released by Jolie after all payments were made.

Pursuant to the guaranty provision, on September 24, 2021 Oliynik emailed three documents to Schummer reflecting a guarantee provided by Shefler's bank. The first document was a letter to Shefler from a bank with the subject line "[c]onfirmation of the banking relationship." The letter stated Shefler had been a client of the bank since 2006 and had "an active Wealth Management relationship with asset balance exceeding USD 39 [million]."

The second letter was also addressed to Shefler from a bank with the subject line "Your request as regards the issuance of a bank guarantee." (Boldface omitted.) This letter stated it was related to the proposed purchase by Tenute of "100% shares of Nouvel LLC, a limited liability company registered under the laws of the State of California, USA . . . from an individual domiciled in the USA acting as seller." The letter continued, "You have informed us that the [proposed transaction] will provide for, *inter alia*, the payment of the purchase price to the Seller in installments. We understand that the Seller requires that the payment of certain post-closing installments be backed by a first demand bank guarantee . . ., such guarantee being a condition precedent to the closing [of the proposed transaction].

8

[¶] . . . [The bank] is pleased to inform you that it would agree to issue a guarantee in relation to the [proposed transaction]."

The third document attached to Oliynik's email was an unsigned letter from the guarantor bank addressed to Jolie, care of Bird in Los Angeles. The letter stated the bank guaranteed the payment of up to $39 million to Jolie upon her written demand informing the bank that Tenute had failed to meet its payment obligations.

C.    *Post-closing Communications Regarding Pitt*

Even before the deal closed, SPI Group and Stoli Group representatives recognized that Pitt was likely to be unhappy with Tenute's acquisition of Nouvel and its resulting stake in Miraval. Approximately two weeks before the agreement was finalized, the Stoli Group CFO emailed several Stoli Group and SPI Group employees, including Oliynik, stating, "The Founder [Shefler] has asked that this team quickly convene to pull together a clear plan articulating the benefits of our business to [Miraval]."

A few days after the agreement with Jolie was signed, Culyba emailed Bird stating, "Thanks again for all of your help in getting this transaction to the finish line. It has been a pleasure working with you." The email also forwarded a letter from Shefler to be provided to Jolie. In the letter, Shefler thanked Jolie for her "trust in me and my company. I can assure you that Miraval is safe with me. [¶] I would also like to thank you for your willingness to assist in resolving potential issues with the remaining shareholders of the company. [¶] Obviously this is a unique transaction and in certain respects it is not as straight forward as we would all like it to be."

9

On October 6, 2021 Fatkullina sent an email to Pitt's business manager stating, "Mr. Yuri Shefler, the Founder of Stoli Group, which purchased 50% of Chateau Miraval and the Miraval brand from Angelina Jolie, would like to pass a letter . . . to Mr. Pitt as well as invitation for a personal meeting in order to set the way forward as regards to the above." The email attached a letter from Shefler to Pitt in which Shefler wrote, "[M]y company Tenute del Mondo (TDM) . . . has acquired [an] interest in Chateau Miraval and the Miraval brand. [¶] . . . [¶] I hope that [the] experience of my team would be very beneficial for both sides and would help to take Miraval brand to the next level. [¶] I suggest to organise a meeting between us and discuss the way forward in regards to Miraval."

On October 27, 2021 Shefler sent Fatkullina a lengthy text message to be forwarded to Pitt in which Shefler responded to a recent communication from Pitt. Based on Shefler's response, it appears Pitt had accused Shefler of making demands on Miraval distributors and infringing on Pitt's rights. Shefler responded that he did not intend to disrupt Miraval's operations, and he hoped they could "proceed further in a constructive manner, with [Pitt] accepting that there is a new partner."

Pitt continued to resist cooperation with Nouvel, and according to Nouvel's cross-complaint, Mondo Bongo sued Nouvel in Luxembourg twice in late 2021 regarding the distribution of Quimicum shares. Mondo Bongo also allegedly rejected Tenute's proposals for how to manage Quimicum, resulting in a deadlock among Quimicum's directors.

Once it became clear that Pitt was not amenable to having Tenute as a partner, Shefler reached out to Jolie regarding the installment payments due under the purchase agreement. On

10

January 13, 2022 Fatkullina emailed Schummer a letter from Shefler to Jolie. In the letter, Shefler requested Jolie "consider extension of the remaining payments for [a] couple of months, which would really help my company to deal with the situation." Shefler proposed that payment of the remaining $29 million (that was already due) be made in five installments between February and July 2022.

D.    *The Lawsuit*

On February 17, 2022 Pitt and Mondo Bongo filed a complaint, and on June 21, 2023 a second amended complaint, against Jolie, Nouvel, Shefler, Oliynik, SPI Group, and Tenute. The second amended complaint alleged nine causes of action, including as to Shefler (and other defendants), tortious interference with contractual relations, tortious interference with prospective business relations, violation of the Luxembourg Civil Code, and for imposition of a constructive trust. Pitt and Mondo Bongo alleged that "Pitt and Jolie were subject to an implied-in-fact contract" pursuant to which they could not sell their interests in Miraval without the other's consent. Shefler intentionally induced Jolie to breach that obligation and orchestrated the purchase of Nouvel in secret "to facilitate the breach of Pitt's rights and to prevent him from protecting or exercising his rights." Similarly, Shefler intentionally interfered with "Mondo Bongo's contractual relationships with Nouvel and Quimicum."

On September 6, 2022 Nouvel filed a cross-complaint against Pitt, Mondo Bongo, and others alleging seven causes of action, including for tortious interference with contractual relations and interference with prospective economic advantage.

11

The cross-complaint alleged that Pitt and Mondo Bongo, as part of Pitt's "vindictive war" against Jolie and Nouvel, had devalued Miraval's assets, taken control of Miraval, and prevented Nouvel from participating in Miraval's management.

E.    *The Motion To Quash Service of Summons*

On August 28, 2023 Shefler moved to quash service of summons under Code of Civil Procedure section 418.10 for lack of personal jurisdiction.[5]  In his motion, Shefler stated he was a resident of Switzerland and did not participate in the negotiations for the purchase of Nouvel, nor did he travel to California or send any correspondence to California "other than [a] few letters."  Therefore, because he did not have substantial contacts with California, he was not subject to specific jurisdiction in California.  Shefler's attorney submitted a declaration in support of the motion, which authenticated certain emails and discovery responses.  Shefler did not submit a declaration on his own behalf.

In their opposition, Pitt and Mondo Bongo argued Shefler "personally orchestrated" the purchase of Nouvel and "was a critical participant in [the] negotiation, both directly and from behind the scenes."  Further, Shefler pursued the deal "to elbow his way into a partnership between Pitt and Jolie—two

---

[5]    SPI Group also moved to quash service of summons, which the trial court granted on March 13, 2024.  Oliynik likewise moved to quash service of summons, and the court found that Pitt and Mondo Bongo "did not establish that the Court has personal jurisdiction over Defendant Oliynik."  However, the court denied Oliynik's motion as moot after Pitt and Mondo Bongo filed a third amended complaint in April 2024.

California-based celebrities—in order to profit from Pitt's fame." Thus, the negotiations and resulting agreement constituted purposeful direction of activity at California; the lawsuit's allegations arose out of those forum-related activities; and Shefler was subject to jurisdiction in California courts. In support of their opposition, Pitt and Mondo Bongo submitted almost 500 pages of documents produced during jurisdictional discovery to show Shefler's involvement in the transaction.

Oliynik submitted a declaration in support of Shefler's reply in which Oliynik stated, "I negotiated the purchase of the membership interest in Nouvel, LLC from Angelina Jolie on behalf of Tenute del Mondo, B.V., a member of the Stoli Group (the 'Transaction'). [¶] In my capacity as an executive of the Stoli Group, I communicate with Mr. Shefler. I have personal knowledge of Mr. Shefler's level of involvement in the Transaction. [¶] Mr. Shefler played no role in determining the structure of the Transaction or any terms of the Transaction other than the financial terms." (Paragraph numbers omitted.) Olinyik further declared that Shefler "was not sent or shown any version, including any draft," of the purchase agreement, exclusivity agreement, or confidentiality agreement entered by Tenute and Jolie. Shefler's attorney also submitted a declaration with Shefler's reply. The attorney stated that, in response to discovery requests, "five of Shefler's email accounts and one cellphone belonging to Shefler were searched" for documents responsive to the requests. The attorney further stated he had reviewed the documents produced from Shefler's files and none of the agreements at issue in this case was "produced from Shefler's files," nor did the document "production show that they were sent to him by any other custodian."

13

At the outset of the March 15, 2024 hearing on Shefler's motion to quash, the trial court asked Pitt and Mondo Bongo's counsel to focus on "the specific evidence that shows Yuri Shefler purposefully availing himself of this forum. . . . Because I'm not seeing it. . . . Here we have these interactions between Mr. Shefler—these emails saying thank you after something is already—has already taken place or emails about what's going on with this transaction and maybe the person happens to have a residence in California. That doesn't seem to be the targeting that our California courts have been talking about . . . ." After hearing argument from the parties, the court granted the motion, stating, "What plaintiffs have set forth was—had more to do with other parties' forum-related contacts and not with those of Yuri Shefler. . . . I'm looking really at whether Yuri Shefler purposely availed himself of the California forum and whether plaintiffs' claims relate to or arise out of Yuri Shefler's forum-related contacts, and that just has not been demonstrated by a preponderance of the evidence."

Pitt and Mondo Bongo timely appealed.

## DISCUSSION

A. *Governing Law and Standard of Review*

California courts may exercise personal jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.) The exercise of jurisdiction over a nonresident defendant comports with the California and United States Constitutions if the defendant has such minimum contacts with California that the assertion of jurisdiction does not violate traditional notions of fair play and

14

substantial justice.  (*Snowney v. Harrah's Entertainment, Inc.*
(2005) 35 Cal.4th 1054, 1061 (*Snowney*); *Pavlovich v. Superior
Court* (2002) 29 Cal.4th 262, 268 (*Pavlovich*); see *Ford Motor Co.
v. Montana Eighth Judicial District Court* (2021) 592 U.S. 351,
358 (*Ford Motor Co.*) [under *International Shoe Co. v.
Washington* (1945) 326 U.S. 310, 316-317 "a tribunal's authority
depends on the defendant's having such 'contacts' with the forum
State that 'the maintenance of the suit' is 'reasonable, in the
context of our federal system of government,' and 'does not offend
traditional notions of fair play and substantial justice'"].)

Under the minimum contacts test, personal jurisdiction
may be either general or specific.  (*Ford Motor Co., supra*,
592 U.S. at p. 358; *Bristol-Myers Squibb Co. v. Superior Court*
(2017) 582 U.S. 255; *Snowney, supra*, 35 Cal.4th at p. 1062.)
General jurisdiction exists when the defendant's contacts with
the forum state are so "'substantial'" or "'continuous and
systematic'" that it is consistent with traditional notions of fair
play and substantial justice to subject the defendant to the
jurisdiction of the forum even when the cause of action is
unrelated to the defendant's contacts with the forum.  (*Vons
Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 445-
446 (*Vons Companies*); accord, *Daimler AG v. Bauman* (2014)
571 U.S. 117, 126-127.)

Specific jurisdiction requires some nexus between the cause
of action and the defendant's activities in the forum state.  Under
well-established case law, specific jurisdiction exists when (1) the
defendant has "'purposefully availed himself or herself of forum
benefits'"; (2) the controversy is related to or arises out of the
defendant's contacts with the forum; and (3) the assertion of
personal jurisdiction would comport with "'"fair play and

15

substantial justice.""'" (*Pavlovich, supra*, 29 Cal.4th at p. 269; accord, *Ford Motor Co., supra*, 592 U.S. at pp. 358-360; *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 472-473; *Vons Companies, supra*, 14 Cal.4th at p. 446.)  There are no bright-line rules for determining jurisdiction.  "'[R]ather, the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present.'" (*Pavlovich*, at p. 268; see *Burger King Corp.*, at pp. 485-486 ["'the facts of each case must [always] be weighed' in determining whether personal jurisdiction would comport with 'fair play and substantial justice.'"]; *Rivelli v. Hemm* (2021) 67 Cal.App.5th 380, 392 (*Rivelli*) [analysis of specific jurisdiction is "intensely fact-specific"].)

When a defendant moves to quash service of process based on lack of personal jurisdiction, the plaintiff bears the initial burden of establishing the first two elements of specific jurisdiction by a preponderance of the evidence.  (*Vons Companies, supra*, 14 Cal.4th at p. 449; *Epic Communications, Inc. v. Richwave Technology, Inc.* (2009) 179 Cal.App.4th 314, 326-327.)  "The plaintiff must come forward with affidavits and other competent evidence to carry this burden and cannot simply rely on allegations in an unverified complaint."  (*ViaView, Inc. v. Retzlaff* (2016) 1 Cal.App.5th 198, 210; see *Rivelli, supra*, 67 Cal.App.5th at p. 393.)  If the plaintiff meets this initial burden, "the out-of-state defendant then bears the burden of convincing the court why the exertion of personal jurisdiction would not comport with fair play and substantial justice."  (*Jacqueline B. v. Rawls Law Group, P.C.* (2021) 68 Cal.App.5th 243, 253.)

When the evidence of jurisdictional facts is in conflict, we resolve that conflict in favor of the trial court's order, as long as it is supported by substantial evidence. (*Snowney, supra*, 35 Cal.4th at p. 1062; *Vons Companies, supra*, 14 Cal.4th at p. 449.) Where, as here, the evidence is undisputed, the question of jurisdiction is one of law, and we independently review the trial court's decision.[6] (*Snowney*, at p. 1062; *Vons Companies*, at p. 449.)

B.  *The Trial Court Had Specific Jurisdiction over Shefler*

1.  *Pitt and Mondo Bongo presented evidence of purposeful availment*

""""The purposeful availment inquiry . . . focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs [its] activities toward the forum so that [it] should expect, by virtue of the benefit [it] receives, to be subject to the court's jurisdiction based on" [its] contacts with the forum.'" (*Snowney, supra*, 35 Cal.4th at pp. 1062-1063.) Thus, purposeful availment occurs where a nonresident defendant "(1) purposefully directs its activities at the forum state's residents, (2) purposefully derives a benefit from its activities in the forum state, or (3) purposefully invokes the privileges and protections of the forum state's laws by (a) purposefully engaging in 'significant activities' within the

---

6  Shefler argues the trial court "relie[d] on several factual determinations as to Shefler's involvement with the at-issue transaction." However, the examples Shefler provides are simply the court's recitation of undisputed facts in the record, for example, that Shefler "sent emails about . . . 'what's going on with this transaction.'"

forum state or (b) purposefully creating 'continuing [contractual] obligations' between itself and the residents of the forum state." (*Jacqueline B. v. Rawls Law Group, P.C., supra*, 68 Cal.App.5th at p. 253; accord, *Snowney*, at p. 1063.)

"By limiting the scope of a forum's jurisdiction in this manner, the '"purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts . . . .' [Citation.] Instead, the defendant will only be subject to specific jurisdiction if '"it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the state."'" (*Snowney, supra*, 35 Cal.4th at p. 1063; see *Walden v. Fiore* (2014) 571 U.S. 277, 286 (*Walden*) ["Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State."].)

It is well settled that ""'neither ownership nor control of a subsidiary corporation by a foreign parent corporation, without more, subjects the parent to the jurisdiction of the state where the subsidiary does business."'" (*SK Trading Internat. Co. Ltd. v. Superior Court* (2022) 77 Cal.App.5th 378, 388 (*SK Trading*).) However, "activities that are undertaken on behalf of a defendant may be attributed to the defendant for purposes of personal jurisdiction if the defendant purposefully directed those activities toward the forum state." (*Anglo Irish Bank Corp., PLC v. Superior Court* (2008) 165 Cal.App.4th 969, 981-982; see *Burger King Corp. v. Rudzewicz, supra*, 471 U.S. at p. 479, fn. 22 ["We

18

have previously noted that when commercial activities are 'carried on in behalf of' an out-of-state party those activities may sometimes be ascribed to the party [citation], at least where he is a 'primary participan[t]' in the enterprise and has acted purposefully in directing those activities."]; *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 552 [in assessing purposeful availment, "[t]he critical acts may be taken directly by the parent or indirectly through the subsidiary, but in all events must be attributable to the parent corporation itself"].)

Shefler contends he did not direct any activities at the California forum (or its residents or companies) because the transaction at issue, purchasing Nouvel, was principally conducted between negotiators in Europe to obtain the ownership of a French company (Miraval). Further, even if Tenute purposefully availed itself of the benefits of the California forum, Shefler had no personal involvement in the transaction. Contrary to Shefler's contention, the evidence shows Tenute and Shefler directed activities at California residents and companies.

Tenute acquired all the shares of a California company (Nouvel) from a California resident (Jolie), and the contract included four installment payments to that California resident. This resulted in Tenute's ownership of a company subject to California laws and regulations, and the purchase created an ongoing relationship with Jolie regarding the installment payments. In addition, the tortious interference claims allege that in purchasing Nouvel, Tenute (and Shefler and others) intended to interfere with the rights of another California company (Mondo Bongo) owned by another California resident (Pitt). The result of the transaction was an ongoing business relationship between the two California companies (Nouvel and

19

Mondo Bongo), albeit concerning ownership of a Luxembourg company (Quimicum) and its French subsidiary (Miraval). While the primary negotiators for Tenute and Nouvel (Oliynik and Culyba) were based in Europe, they had direct contact with Jolie and her representatives in California. For example, after the transaction closed, Culyba emailed Bird, Jolie's Los Angeles-based business manager, stating, "[t]hanks again for all your help" on the deal and "[i]t has been a pleasure working with you." It is a reasonable inference from this email that Culyba had multiple contacts with Bird during the negotiations. In addition, the letter from Shefler's bank confirming the guarantee was addressed to Jolie, care of Bird at a Los Angeles address. Finally, the purchase agreement and the exclusivity agreement preceding it both included California choice of law provisions.

This evidence shows that Tenute directed activities at California residents and companies and derived a benefit from those activities, subjecting it to ongoing obligations within California. Thus, Tenute purposefully availed itself of forum benefits. (See *Rivelli, supra*, 67 Cal.App.5th at pp. 396-397 [purposeful availment requirement was met where foreign defendant purchased shares in California company, including governing rights that placed it in an ongoing business relationship with the company (although jurisdiction failed on second prong of relation to forum contacts)]; *Gilmore Bank v. AsiaTrust New Zealand Ltd.* (2014) 223 Cal.App.4th 1558, 1564-1565 [purposeful availment requirement met where foreign defendant marketed benefits of New Zealand trust to California resident, entered into contract by email to act as trustee for California resident, and sent funds to California resident despite never travelling to California in connection with the contract].)

Shefler seeks to distance himself from Tenute, arguing he was not involved in the negotiations between Tenute and Jolie. The evidence is to the contrary. Shefler "actively adopted and implemented a plan" aimed at California or "personally and directly participated in making the decisions" affecting California. (See *SK Trading, supra*, 77 Cal.App.5th at p. 388.) Despite Shefler's protestations that he was not involved in the details of the purchase of Nouvel, during and immediately after the negotiations he repeatedly referred to Tenute as "my company" and the offer to purchase Nouvel as "my offer." He had conversations with Oliynik regarding how to structure the purchase, including input on the purchase price and timing of the payments. The confidentiality agreement signed by Tenute and Nouvel specifically included a carve-out for disclosure to "the ultimate beneficial owner" of Tenute, an undisputed reference to Shefler. There would be no need for such a provision if Shefler did not intend to be involved in the evaluation of Nouvel's assets for the purpose of structuring a deal.

The record also contains several references to Shefler authorizing or instructing others with respect to the Nouvel acquisition. In May 2021 Shefler provided Oliynik with two proposals for how to structure the purchase of Nouvel. And when Jolie delayed signing the exclusivity agreement, Oliynik told Schummer that Shefler was "considering the advice" of counsel to revoke Tenute's signature. This is strong evidence that Shefler had the ultimate decision-making authority as to whether the negotiations would continue and on what terms. Perhaps the most compelling evidence of Shefler's control of the transaction is the fact that he allowed $39 million of his personal funds to be used as a guarantee for Tenute's payments to Jolie. It defies

21

credulity that Shefler, a sophisticated businessman, would risk almost $40 million on a transaction about which he knew nothing and with which he had no involvement.[7]

Oliynik's statement in his declaration that Shefler "played no role in determining the structure of the [t]ransaction or any terms of the [t]ransaction other than the financial terms" is not inconsistent with a finding that Shefler adopted and implemented a plan aimed at acquiring a California entity or that Shefler participated in the decision-making process. Oliynik's statement acknowledges that Shefler was involved in determining the financial terms of the transaction, which are a significant aspect of the purchase agreement. Further, the fact that documents produced by Shefler do not contain the relevant contracts (according to the declarations of Oliynik and Shefler's attorney) is not inconsistent with Shefler being aware of the

---

[7]    Shefler relies on *Sibley v. Superior Court* (1976) 16 Cal.3d 442 for the proposition that providing a guarantee to a California resident does not give rise to jurisdiction over the guarantor.  In *Sibley*, a Florida resident provided a guarantee to a California corporation regarding the contractual performance of a Georgia corporation.  (*Id.* at p. 323-324.)  The Supreme Court found the defendant was not subject to jurisdiction in California because he was not involved in the negotiation of the contract, was not in a position to benefit from the contract, and had no connection to the transaction other than to guarantee the Georgia company's performance.  (*Id.* at pp. 445, 447-448.)  Here, Shefler was directly involved in the acquisition of Nouvel and, as the beneficial owner of Tenute, stood to gain from the transaction. Thus, while providing a guarantee alone may not be sufficient to confer jurisdiction, Shefler was much more involved in the Nouvel acquisition than the defendant in *Sibley*.

terms of the deal and having authority and a role in the negotiation and implementation of the sale.

In addition, Shefler sent three letters to Jolie during the course of the transaction. The July 2021 letter thanked Jolie for accepting the purchase offer and assured her that a deal would be made despite "potential complications." The October 2021 letter thanked Jolie for her trust and her "willingness to assist in resolving potential issue[s]" with Pitt and Mondo Bongo. The third letter to Jolie requested a postponement of the remaining installment payments. Far from inconsequential, these letters demonstrate Shefler's continuing communications with a California resident and his direct involvement in ensuring the deal was consummated, including his soliciting Jolie's involvement to address Shefler's dispute with Pitt (over buying Nouvel), and his negotiating the payment terms under the agreement. Similarly, Shefler's communications with Pitt in October 2021 involved a California resident (Pitt) in discussions about the partnership between two California companies (Nouvel and Mondo Bongo). This evidence also supports finding jurisdiction over Shefler. (See *Moncrief v. Clark* (2015) 238 Cal.App.4th 1000, 1004, 1007 [foreign defendant purposefully availed himself of benefits of California through one telephone call and one email to California resident regarding ownership of equipment to induce the California resident to finalize the purchase of the equipment].)

The holding in *SK Trading, supra*, 77 Cal.App.5th 378 supports a finding of Shefler's purposeful availment. In that case, the California Attorney General brought an action against a Korean company, SK Trading, and its California subsidiary, SK Energy, alleging a conspiracy to manipulate and drive up the

23

prices in the California gasoline market.  (*Id.* at p. 382.)
SK Trading moved to quash service of summons, arguing it never
conducted business in California and did not control SK Energy's
day-to-day operations.  (*Id.* at p. 384.)  Nevertheless, the court
found SK Trading "purposefully engaged in activities that should
have led it to reasonably anticipate being required to defend
those activities in California legal proceedings."  (*Id.* at p. 392.)
The Court of Appeal explained that SK Trading had conceived a
plan to improve its California profits and "encouraged"
SK Energy to hire a new gasoline trader for that purpose.  (*Id.* at
p. 385.)  An SK Trading executive interviewed the proposed
trader (in Houston) and provided final approval for his hiring;
executives of SK Trading and SK Energy met regularly outside of
California to discuss the California market; and SK Energy
submitted a weekly report to SK Trading regarding SK Energy's
performance in the California gasoline market.  (*Id.* at pp. 385-
386, 390.)

Based on these activities, the *SK Trading* court found that
"SK Trading's contacts with California . . . reflect more than a
passive investment or ownership of a subsidiary.  The record
establishes that SK Trading actively adopted and implemented a
plan designed to increase SK Energy's profits [in California]" and
actively participated in the hiring and management of the
California trader.  (*SK Trading, supra*, 77 Cal.App.5th at p. 388.)
On these facts the court found that despite SK Trading's lack of a
presence in California or direct participation in California
trading, "SK Trading officers personally and directly participated
in making the decisions affecting the California gasoline market"
such that a finding of purposeful availment was proper.  (*Ibid.*;
see also *Anglo Irish Bank Corp., PLC v. Superior Court, supra*,

24

165 Cal.App.4th at p. 981 [Irish bank purposefully availed itself of benefits of doing business in California where it sent its foreign subsidiary's employees to California to solicit investments in another a foreign subsidiary, approved credit applications, and "worked closely" with its subsidiaries in connection with the California investments].) The same is true of Shefler here—while he was not the primary negotiator for the purchase of Nouvel from Jolie, he actively participated in making decisions regarding the transaction (to buy a California company from a California resident) and he played an integral role in ensuring the deal was successful.

Shefler contends the United States Supreme Court's decision in *Walden, supra*, 571 U.S. 277 defeats personal jurisdiction because the "effects" of Shefler's conduct in California cannot show purposeful availment. *Walden* does not assist Shefler. In *Walden*, a police officer working on a drug interdiction task force at an airport in Atlanta seized almost $100,000 in cash from two travelers during a layover on their trip from Puerto Rico to their home state of Nevada. (*Id.* at pp. 279-280.) The travelers later sued the officer in Nevada claiming he had violated their Fourth Amendment rights. (*Id.* at p. 281.) The Supreme Court held the officer did not have sufficient minimum contacts with Nevada to support jurisdiction in the state because there was no showing "the *defendant's* actions connect him to the *forum*." (*Id.* at p. 289.)

The United States Supreme Court rejected the travelers' argument that jurisdiction was proper because the officer's actions had an effect on Nevada residents, explaining, "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on

25

the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." (*Walden, supra*, 571 U.S. at p. 286.)  Further, the officer "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada."  (*Id*. at p. 289.)  Accordingly, the officer's "actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections."  (*Ibid*.)

In contrast to the officer in *Walden*, Shefler had substantial contacts with California, including, as discussed, contacting individuals in California, directing others to contact individuals in California, targeting a California company for purchase, and sending payments to California.  Thus, Shefler's actions connected him directly to California and not merely to a resident who happened to live there.  (See *Ford Motor Co., supra*, 592 U.S. at p. 371 ["as *Walden* held[,] the place of a plaintiff 's injury and residence cannot create a defendant's contact with the forum State," but "[t]hose places still may be relevant in assessing the link between the defendant's forum contacts and the plaintiff 's suit"].)

2.   *Pitt's and Mondo Bongo's claims arise out of Shefler's actions directed to California*

Shefler contends with respect to the second prong of the minimum contacts test that his only contacts with California were the messages he sent to Jolie and Pitt, and those contacts did not give rise to the claims in this case.  Further, Pitt and Mondo Bongo are "not suing Shefler because he and Jolie exchanged pleasantries" or because of "Pitt's supposed annoyance at having to work with a business partner."  However, as

26

discussed, Shefler directed his activities to California through his oversight and involvement in the acquisition of a California company from a California resident, and that transaction had a direct effect on the rights of another California company and resident.

Accordingly, the second prong of the minimum contacts test is satisfied in this case:  Pitt's and Mondo Bongo's claims of tortious interference arise out of or relate to Shefler's participation in the negotiation and purchase of Nouvel.  (See *Pavlovich, supra*, 29 Cal.4th at p. 268; accord, *Vons Companies, supra*, 14 Cal.4th at p. 452 ["as long as the claim bears a substantial connection to the nonresident's forum contacts, the exercise of specific jurisdiction is appropriate"].)

3.  *The exercise of personal jurisdiction over Shefler is not unreasonable or unfair*

The third prong of the minimum contacts test—whether the assumption of jurisdiction over Shefler is unreasonable or offends traditional notions of fair play and substantial justice—requires consideration of """the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief."""  (*Snowney, supra*, 35 Cal.4th at p. 1070.)  In a case involving an international defendant, the court also "consider[s] the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by the California court."  (*Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102, 115; accord, *F. Hoffman-LaRoche, Ltd. v. Superior Court* (2005) 130 Cal.App.4th 782, 805.)  At this stage a defendant may defeat jurisdiction only by presenting "'a compelling case that the presence of some other

27

considerations would render jurisdiction unreasonable.'" (*Snowney*, at p. 1070.)

Shefler's contention that a finding of jurisdiction would be unfair or unreasonable is not persuasive. He argues in a conclusory fashion that it would be burdensome to force him to litigate in California. While it may be inconvenient for a Swiss resident to be subject to jurisdiction in California, Shefler has not presented any evidence that litigating in a California court would be a financial hardship or result in a severe disadvantage. (See *Vons Companies, supra*, 14 Cal.4th at p. 477 [to defeat jurisdiction, burdens on defendant must be "such 'as to make litigation "so gravely difficult and inconvenient"' that [the defendant] would be at a "'severe disadvantage'" [citation] in comparison to [the plaintiff]"]; see also *Asahi Metal Industry Co. v. Superior Court, supra*, 480 U.S. at p. 114 ["[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant"].) Shefler also argues that exercising jurisdiction over him would be unfair because Pitt and Mondo Bongo can obtain complete relief without Shefler's presence in the case. But Shefler ignores the fact that Pitt and Mondo Bongo allege Shefler personally interfered with their rights separate and apart from the claims made against the other defendants.

28

## DISPOSITION

The order granting Shefler's motion to quash is reversed. Pitt and Mondo Bongo are to recover their costs on appeal.

FEUER, J.

We concur:


SEGAL, Acting P. J.


STONE, J.